849 A.2d 171

SYDNEY WEISHAUS, PLAINTIFF–APPELLANT AND CROSS–RESPONDENT, v. MARVIN WEISHAUS, DEFENDANT–RESPONDENT AND CROSS–APPELLANT.

Argued November 17, 2003—Decided June 9, 2004.

*Stephen H. Roth* argued the cause for appellant and cross-respondent (*Mr. Roth,* attorney; *Mr. Roth* and *Michele M. DeSantis,* on the briefs).

*Lorraine R. Breitman* argued the cause for respondent and cross-appellant (*Rose & DeFuccio,* attorneys).

*John F. DeBartolo* argued the cause for amicus curiae New Jersey State Bar Association (*Karol Corbin Walker,* President,

attorney; *Ms. Walker,* of counsel; *Mr. DeBartolo* and *Bonnie C. Frost,* on the brief).

*Laurence J. Cutler* submitted a brief on behalf of amicus curiae Matrimonial Lawyers Alliance *(Cutler, Simeone, Townsend, O'Donnell & Tomaio,* attorneys; *Mr. Cutler, Charles C. Abut, Robert J. Durst, II, Frank A. Louis, Richard A. Norris* and *Gary N. Skoloff,* on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

In this matrimonial appeal, we revisit our decision in *Crews v. Crews,* 164 *N.J.* 11, 751 *A.*2d 524 (2000). *Crews* clarified the principles governing an application for modification of alimony. In *Crews,* we also addressed whether marital lifestyle findings should be made upon entry of a divorce judgment that includes support so as to facilitate the efficient handling of subsequent modification applications. We directed the lower courts, when setting an alimony award, to make findings establishing the standard of living during the marriage (the "marital standard") and, as part of the court's assessment of the adequacy and reasonableness of the award, to determine whether the award will enable the parties to enjoy a lifestyle that is "reasonably comparable" to that enjoyed during the marriage. *Id.* at 26, 751 *A.*2d 524. Although *Crews* involved a contested divorce and, therefore, presented a full trial record, in *dicta,* we indicated that the same judicial findings should be made in uncontested cases. We stated that

> [t]he setting of the marital standard is equally important in an uncontested divorce. Accordingly, lest there be an insufficient record for the settlement, the court should require the parties to place on the record the basis for the alimony award including, in pertinent part, establishment of the marital standard of living, before the court accepts the divorce agreement.
>
> [*Ibid.*]

We are asked to revisit that pronouncement in the context of this uncontested case. Specifically, we are asked to reconsider our determination that the finding of the marital standard should be mandatory in every uncontested case that involves a provision for support.

## I.

A summary of the facts underlying this divorce action appears in the published opinion of the Appellate Division. *Weishaus v. Weishaus,* 360 *N.J.Super.* 281, 285–289, 822 *A.*2d 656 (2003). We recite here only those aspects of the facts and procedural history that are necessary to our disposition.

Plaintiff, Sydney Weishaus (now Sydney Silver), filed a complaint in 2000 to divorce defendant, Marvin Weishaus, her husband of fifteen years. Plaintiff's Case Information Statement (CIS) listed an annual marital lifestyle amount of $436,140 for herself and her three children (although at separation only the younger two children were residing with her). Her CIS specified that defendant's mother paid for approximately $41,000 of the family's expenses each year and that part of that amount was for activities of the children. Plaintiff's CIS also specified that certain expenses were paid for by a company owned and operated by defendant.

Defendant's CIS listed living expenses of $210,732 for himself and one child. His CIS did not specify the source of funds for any of the listed expenses. Defendant's CIS also indicated liabilities owed to his mother in the amount of $440,000.

Approximately a year into the litigation, the parties entered into a Property Settlement Agreement (Agreement), which provided that plaintiff would receive term alimony for three years in the following amounts: year one, $28,400; year two, $23,400; and year three, $15,000. Plaintiff agreed to the three-year term of alimony, and acknowledged that defendant "has taken into consideration the equitable distribution and the terms of this Agreement when agreeing to pay [plaintiff] the aforesaid amount of alimony for a period of three (3) years and [defendant] would not have agreed to the terms of the equitable distribution if alimony extended beyond the three (3) year period." *Id.* at 286, 822 *A.*2d 656. The Agreement called for defendant to pay child support for the children living with plaintiff as follows: "from July 1, 2001 until June 20, 2002 at the rate of $7,500 per year per child; from July 1,

2002 until June 30, 2003, at a rate of $7,000 per year per child; from July 1, 2003 until June 30, 2004, at the rate of $6,500 per year per child; from July 1, 2004 until the middle child 'goes to college', at the rate of $6,000 per child." *Ibid.*

A final hearing on the parties' divorce came before the court on July 2, 2001. The parties proffered the Agreement and limited testimony. Plaintiff testified that: the Agreement resolved all financial issues between the parties and she was entering into the Agreement voluntarily; the Agreement was fair and reasonable; she was represented by counsel to her satisfaction in the negotiation of the Agreement; she had no questions about the Agreement and understood specifically that the Agreement would require her to seek employment; the alimony was for a three-year term; and the amount of alimony was set in consideration of the terms of the equitable distribution.

Plaintiff testified further as follows:

Q. Now under the circumstances and under the financial support that is provided in this agreement, you will be able to resume or live a standard which is consistent or commensurate with the standard enjoyed by both of you during the course of the marriage even though you will be residing in the former marital household.

A. Not at all.

Q. Okay. Can you tell the court and counsel why that is the case?

A. During our marriage we were supported by [defendant]'s mother who is very wealthy in large part. And I am no longer sharing in that subsidy—that additional income that [defendant] gets. So that—that's partially why. And the other piece is that we did have joint assets which I needed to use in order to maintain—to live during this two year period of time. And also a substantial drop in the stock market made us lose some of that money as well. So for those two reasons I will not be able to live as I lived before and during the marriage.

Q. And the standard of living that you did enjoy in the marriage was accurately represented in the case information statement that you filed with the Court during the pendency of this action. Is that correct?

[A]. Yes, correct.

[*Id.* at 287, 822 A.2d 656.] [1]

---

[1] One of the "joint assets" was an investment account with Paine Weber (Paine Weber account) that from an alleged initial investment of under $3,000, rose at one point to approximately $1.8 million. At the time of the final hearing, after

Defendant testified that: the Agreement resolved all financial issues between the parties and he was entering into the Agreement voluntarily; the Agreement was fair and reasonable; he was represented by counsel to his satisfaction in the negotiation of the Agreement; and he had no questions about the Agreement.

Because plaintiff stated that she would not be able to maintain the marital lifestyle under the terms of the Agreement, the court made findings required under *Crews*. First, the court adopted the parties' statement in the Agreement that defendant's average annual income was $125,000 for the period 1997 through 1999. The court determined that other sources of income, specifically earlier monetary contributions received from defendant's mother as well as income from a previously held, but now worthless, Paine Weber account, were not within defendant's control and declined to include them when establishing marital lifestyle. Next, the court imputed to plaintiff a salary of $30,000, based on an expert's evaluation of her employability.[2] The court observed that the alimony set under the Agreement was in consideration of the equitable distribution of property that included the marital home valued as having $260,000 in equity. In light of the alimony and equitable distribution called for by the Agreement and the adjustments to marital lifestyle derived by excluding the specified income, the court concluded that plaintiff would not experience "a shortfall in the marital lifestyle." A judgment of divorce was issued, which incorporated the parties' Agreement, as amended by the court to include the statement, "that Plaintiff can maintain a reasonable and comparable lifestyle excluding any contributions from Defendant's mother."

---

stock declines and margin calls, the Paine Weber account apparently had become worthless.

[2] Plaintiff, who was unemployed during the marriage, holds a masters degree in education. She approved being evaluated by the employability expert pursuant to the Agreement.

Plaintiff appealed. She claimed that 1) the court should not have insisted on establishing the marital standard of living when the parties had reached an agreement on the amount of support notwithstanding their differing views on the marital lifestyle; 2) the two sources of income should not have been excluded from the calculation of the marital standard of living; and 3) the court erred in its ultimate conclusion that plaintiff could maintain a reasonably comparable lifestyle under the terms of the Agreement.[3] The parties later resolved to discontinue the appeal and submitted to the trial court a proposed Consent Order. The proposed Order provided:

1. The following provision of the Judgment be and it is hereby vacated:

"The Court made a finding after testimony that Plaintiff can maintain a reasonable and comparable lifestyle excluding any contributions from defendant's mother."

2. Both parties acknowledge that it is the plaintiff's position that her accustomed standard of living during the parties' marriage is accurately set out on the plaintiff's [CIS].

3. Both parties acknowledge that it is the defendant's position that the parties' accustomed standard of living during their marriage is accurately set out on the defendant's [CIS].

4. Both parties acknowledge that they have not agreed upon what was the parties['] accustomed standard of living during their marriage, but they have agreed not to litigate that issue at this time. The parties also acknowledge and agree that should either party hereafter make an application that requires the Court to ascertain the accustomed standard of living during their marriage, the Court will then be required to determine that issue. The parties further acknowledge that if the plaintiff or the defendant hereafter seeks to modify the alimony provision of the parties [Agreement], which Agreement is incorporated in the Judgment, the Court may then be required to determine, *inter alia* if either party is entitled to relief pursuant to *Crews v. Crews*, 164 *N.J.* 11 [751 *A.*2d 524] (2000).

5. In any such modification proceeding, the finding and conclusion vacated pursuant to paragraph 1 of this Order shall be of no force and effect. Any such modification proceeding shall be heard by a Judge other than the undersigned.

The trial court refused to execute the proposed Order, explaining that, pursuant to *Crews*, trial courts were obliged to make marital-standard-of-living findings prior to finalizing a divorce,

---

[3] The trial court expanded on its oral findings in a letter opinion dated November 7, 2001, filed with the clerk of the Appellate Division pursuant to *Rule* 2:5–1(b). *Weishaus, supra*, 360 *N.J.Super.* at 288, 822 *A.*2d 656.

even when the sole issue in dispute is the parties' marital lifestyle. The court considered the *Crews* mandate as non-waivable and concluded that the parties' proposed Order thwarted the policies of judicial economy and efficiency promoted by *Crews*.

Plaintiff sought reconsideration of the rejected Consent Order. Coincidentally, on June 14, 2001, the Supreme Court Family Division Practice Committee Subcommittee on General Procedures and Rules released a "Revised Statement Concerning *Crews v. Crews* " (Revised Statement), that recommended an approach to address *Crews* marital lifestyle issues in the context of a settling divorce action. The Revised Statement recommended that courts make a "limited finding" in matters where parties agree to settle all aspects of their divorce except the marital lifestyle and/or the ability of one or both of the parties to maintain the marital lifestyle under the proposed alimony award. In such circumstances, the Revised Statement proposed that courts include a brief description of the martial lifestyle on the record and hear testimony from both spouses on the adequacy of the alimony award to maintain the supported spouse at the marital lifestyle.

One member of the Subcommittee, the Honorable Ellen L. Koblitz, Presiding Judge, Family Part, Bergen County, dissented from the Revised Statement. Judge Koblitz disagreed with the Revised Statement's fundamental premise that *Crews* did not require trial courts to make definitive findings concerning the marital lifestyle in uncontested divorces and, citing her experience implementing "*Crews*-hearings" in Bergen County, asserted that such findings could be made efficiently and without jeopardizing the judiciary's interest in encouraging settlements in divorce actions. On December 19, 2001, the Revised Statement received a split vote when presented to the Conference of Family Division Presiding Judges.

As noted, the proposed Order was resubmitted to the trial court. Plaintiff contended that the parties' agreement was consistent with the Subcommittee's recommended approach to the *Crews* issues and should be followed. When the court again

refused to execute the proposed Order, plaintiff resumed her appeal.

A unanimous Appellate Division panel affirmed in part and reversed in part. The Appellate Division held that, when the trial court was establishing the marital standard for the purpose of making findings about alimony, the court inappropriately reduced its calculated level to reflect a marital standard value that was sustainable solely by defendant's employment income. *Weishaus, supra,* 360 *N.J.Super.* at 289, 822 *A.*2d 656. Instead, in the panel's view, the trial court should have assessed the actual standard of living enjoyed by the parties during the marriage, including the parties' use of investment income and parental cash subsidies. *Ibid.* Notwithstanding that error in the calculation of marital lifestyle, the Appellate Division, citing *Crews,* held that the trial court properly made determinations in respect of the marital lifestyle and whether plaintiff could lead a comparable lifestyle post-divorce under the terms of the Agreement. *Id.* at 290–92, 822 *A.*2d 656.

This matter is now before us on the Court's grant of the plaintiff's petition and defendant's cross-petition for certification. 177 *N.J.* 495, 828 *A.*2d 922 (2003).

## II.

In *Lepis v. Lepis,* 83 *N.J.* 139, 416 *A.*2d 45 (1980), we established the principle, reaffirmed in *Crews, supra,* that the "goal of a proper alimony award is to assist the supported spouse in achieving a lifestyle that is reasonably comparable to the one enjoyed while living with the supporting spouse during the marriage." 164 *N.J.* at 16, 751 *A.*2d 524. To effectuate that goal, the courts possess the equitable power to set alimony at the time of a divorce, and to monitor and revise alimony on an ongoing basis, as circumstances may require. *Id.* at 24, 751 *A.*2d 524; *Lepis, supra,* 83 *N.J.* at 145, 416 *A.*2d 45; *see also N.J.S.A.* 2A:34–23c (recognizing judicial authority to issue and revise alimony orders). Other equitable powers complement the courts' authority to establish a

sufficient amount of support in each case. *See N.J.S.A.* 2A:34–23a (concerning setting and modification of child support awards); *N.J.S.A.* 2A:34–23h, –23.1 (addressing courts' authority to distribute equitably parties' real and personal property acquired during marriage).

That the obligations and benefits of alimony are governed, on an ongoing basis, by a "changed circumstance" inquiry was well settled prior to *Crews*. See *Lepis, supra,* 83 *N.J.* at 146, 416 *A.*2d 45. Our decision in *Crews,* then, addressed implementation of that inquiry. In *Crews* we explained that the changed-circumstance inquiry used the marital standard of living as the point of measure in the analysis. 164 *N.J.* at 16, 751 *A.*2d 524 (describing marital lifestyle as "the touchstone for the initial alimony award and for adjudicating later motions for modification of the alimony award when 'changed circumstances' are asserted"). Indeed, the modification application by Mrs. Crews that brought that appeal to us highlighted the difficulties posed when a litigated divorce action lacked findings that established the marital standard of living and failed to determine whether the support initially awarded to Mrs. Crews would enable her to live a lifestyle "reasonably comparable" to the marital standard of living. *Id.* at 26, 751 *A.*2d 524.

Those record deficiencies and the consequent burden occasioned to the court and parties prompted us to fashion an approach that would remedy the inefficiencies exemplified in *Crews.* We held that a court setting alimony must make a finding establishing the standard of living during the marriage and, as part of the court's assessment of the adequacy and reasonableness of the support award, must further determine whether the support will enable the parties to enjoy a lifestyle that is "reasonably comparable" to the marital lifestyle. *Ibid.*

*Crews,* as noted, involved an application for alimony modification in a contested divorce. In addition to our actual holding in *Crews,* we offered guidance in respect of an uncontested divorce. We sought to ensure that all necessary information was captured properly and accurately in the event of a future motion to modify

an agreed-upon term and amount of alimony set forth in a consensual agreement. Although our comments were *dicta* because we did not have an uncontested case before us, they were couched in mandatory language. We said that in an uncontested divorce "the court should require the parties to place on the record the basis for the alimony award including, in pertinent part, establishment of the marital standard of living, before the court accepts the divorce agreement." *Ibid.* We were focused, at the time, on underscoring the importance of having the marital standard of living established when the information necessary to such determinations was fresh and could be presented readily. In that respect, we looked to the CIS to capture the necessary information, although we acknowledged the shortcomings of that document for the purpose. *Id.* at 26–27, 751 A.2d 524. Our intention was to fashion an approach that would establish the marital standard at a time when it appeared most efficient to do so, namely, at the time of the entry of a judgment of divorce.

■ In this case the parties agreed to disagree on the subject of marital lifestyle in order to preserve their otherwise-settled action for divorce. We now consider whether the trial courts should have discretion to approve a divorce settlement without making findings in respect of the marital standard in such cases.

Our directory language in *Crews* concerning uncontested divorce actions was offered to encourage parties and courts to make marital lifestyle findings, or at the very least to preserve the evidence necessary to such a determination at the time of entry of a judgment of divorce. Although the parties and *amici* now argue that we should discard the *Crews* requirements concerning the marital standard in all uncontested cases, we decline to do so. We lack objective evidence of the systemic problems that the *amici* have asserted. What we do have is the case presently before us— a complex divorce in which the parties were able to settle all but two issues: the marital lifestyle and the supported spouse's ability to maintain a comparable lifestyle post-divorce under the terms of the support to which she agreed. The lower courts' faithful

adherence to our directive that such cases require court findings on marital lifestyle has resulted in an appeal of an otherwise settled case and the disruption and uncertainty of an unresolved marital action. We come now to the reluctant conclusion that, notwithstanding the economy and efficiency considerations that led to that directive, there are valid reasons to revisit the issue and to allow flexibility to trial courts when entertaining settled divorce actions.

Divorce actions involve personal, even intimate, details of people's lives. The parties are often intensely emotional. Progress toward resolving disputes and reaching a speedy conclusion easily can deteriorate into contentious and difficult interactions that thwart settlement. Therefore, while settlement is an encouraged mode of resolving cases generally, "the use of consensual agreements to resolve marital controversies" is particularly favored in divorce matters. *Konzelman v. Konzelman,* 158 *N.J.* 185, 193, 729 *A.2d* 7 (1999). In *Konzelman,* Justice Handler elaborated on the important role that consensual agreements play in divorce matters:

> Voluntary agreements that address and reconcile conflicting interests of divorcing parties support our "strong public policy favoring stability of arrangements" in matrimonial matters. *Smith v. Smith,* 72 *N.J.* 350, 360, 371 *A.2d* 1 (1977). The prominence and weight we accord such arrangements reflect the importance attached to individual autonomy and freedom, enabling parties to order their personal lives consistently with their post-marital responsibilities.... Thus, it "would be shortsighted and unwise for courts to reject out of hand consensual solutions to vexatious personal matrimonial problems that have been advanced by the parties themselves." *Petersen v. Petersen,* 85 *N.J.* 638, 645, 428 *A.2d* 1301 (1981). For these reasons, "fair and definitive arrangements arrived at by mutual consent should not be unnecessarily or lightly disturbed." *Smith, supra,* 72 *N.J.* at 358, 371 *A.2d* 1. The very consensual and voluntary character of these agreements render them optimum solutions for abating marital discord, resolving matrimonial differences, reaching accommodations between divorced couples, and assuring stability in post-divorce relationships.
>
> [*Id.* at 193–94, 729 *A.2d* 7 (citations omitted).]

Such agreements generally are upheld, to the extent they comply with the equitable precepts embodied in *N.J.S.A.* 2A:34–23a, –23b, and –23.1. *Petersen, supra,* 85 *N.J.* at 642, 428 *A.2d* 1301; *Konzelman, supra,* 158 *N.J.* at 194, 729 *A.2d* 7. A settlement agreement

will be reformed, however, where a party demonstrates that the agreement is plagued by "unconscionability, fraud, or over-reaching in the negotiations of the settlement." *Miller v. Miller,* 160 *N.J.* 408, 419, 734 *A.*2d 752 (1999).

█ In this matter, none of the latter concerns is in play. The trial court amended the parties' Agreement solely because it concluded that it was required by *Crews* to make marital lifestyle findings, and the Appellate Division affirmed on that basis. We now hold that in uncontested divorce actions, trial courts must have the discretion to approve a consensual agreement that includes a provision for support without rendering marital lifestyle findings at the time of entry of judgment. Our holding in *Crews* should no longer be read to require findings on marital lifestyle in every uncontested divorce. A trial court may forego the findings when the parties freely decide to avoid the issue as part of their mutually agreed-upon settlement, having been advised of the potential problems that might ensue as a result of their decision. Even if the court does decide not to make a finding of marital standard, however, it nonetheless should take steps to capture and preserve the information that is available.

We shall refer to the Supreme Court Family Practice Committee for its consideration and recommendation the question of how best to capture marital lifestyle information efficiently and economically. Many suggestions have been advanced in this appeal. We encourage the Committee to consider those, and other suggestions for preemptively easing the burden on parties and the courts when future modification applications arise following an uncontested divorce. Because the trial court here did not believe that it could exercise the independent judgment that we today allow, we are constrained to remand this matter to that court.

### III.

Certification also was granted on the Appellate Division's direction to the trial court in respect of the calculation of marital standard. The Appellate Division concluded that when the trial

court determined the marital standard, "[it] improperly excluded the contributions made by defendant's mother as well as the funds generated by the liquidation and leveraging of marital assets." *Weishaus, supra,* 360 *N.J.Super.* at 289, 822 *A.*2d 656. The Appellate Division noted that "[p]eople are free to live beyond the[ ] means" that their salaries and wages would otherwise afford. *Ibid.* However, it was the "actual" standard of living that the trial court should have used because, in determining marital lifestyle, the trial court is not to pass judgment on the parties' spending habits, or "to extrapolate a sensible lifestyle based on actual earnings." *Weishaus, supra,* 360 *N.J.Super.* at 289, 822 *A.*2d 656; *see also Hughes v. Hughes,* 311 *N.J.Super.* 15, 34, 709 *A.*2d 261 (App.Div.1998) (holding that trial court erred in computing "real" standard of living, which did not include the couple's excessive borrowing).

■ Our determination now makes it unnecessary for the trial court, on remand, to make marital standard findings. Thus, we need not address issues related to the source of the parties' income during the marriage. We note only the following. The finding of the marital standard is just that—a finding that is put to use in one of two settings: at the time of the court's equitable determination of an initial alimony award (which is unnecessary here because the parties agreed to an amount of alimony in their settlement), or later when a party seeks a modification of alimony. In the determination of the marital standard, the court establishes the amount the parties needed during the marriage to maintain their lifestyle. That is separate from the identification of the source of funds that supported that lifestyle, although that information is of use to a court when making an alimony award, or later when deciding a changed-circumstance application. In making either of those determinations, the court necessarily will consider whether there are sufficient presently available funds to sustain the marital standard. If so, then the court may order that that standard be maintained. But if not, due in part to the loss of previous sources of income that cannot be replenished from other

sources, then obviously the marital standard cannot be maintained. In this case, a fact-sensitive determination concerning the parties' marital standard and an appropriate amount of alimony is unnecessary because the parties have reached agreement on alimony payments and have agreed to disagree on marital lifestyle.

## IV.

The judgment of the Appellate Division is reversed in part and affirmed in part, as modified. We remand this matter to the Family Part for further proceedings consistent with this opinion.

*For reversal in part/affirmance in part/remandment*—Chief Justice PORITZ and Justices LONG, VERNIERO, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—7.

*Opposed*—None.