**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3213-19

J.R.,[1]

     Plaintiff-Respondent,

v.

F.R.,

     Defendant-Appellant.

_____

     Argued October 4, 2021 – Decided October 27, 2021

     Before Judges Fasciale and Firko.

     On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FM-02-1533-16.

     Debra S. Weisberg argued the cause for appellant (Donahue, Hagan, Klein & Weisberg, LLC, attorneys; Debra S. Weisberg, of counsel and on the briefs; Francis W. Donahue and Sandra Starr Uretsky, on the briefs).

---

[1] We use initials to identify the parties and third party to protect and preserve the confidentiality of these proceedings. R. 1:38-3(d)(10).

Gary Newman argued the cause for respondent (Newman, McDonough, Schofel & Giger, PC, attorneys; Gary Newman and David Giannini, on the brief).

PER CURIAM

In this post-judgment matrimonial matter, defendant F.R. appeals from paragraph one of a March 6, 2020 Family Part order denying without prejudice his motion seeking to be relieved of his alimony and related obligations based on plaintiff J.R.'s alleged cohabitation with M.S. under N.J.S.A. 34-23(n). Defendant contends he established a prima facie case of cohabitation warranting discovery and a plenary hearing. We have considered these arguments in light of the record, disagree, and affirm.

I.

We derive the facts from the record. The parties were married on October 28, 1989, and divorced pursuant to a final judgment of divorce (FJOD) on January 18, 2018. Plaintiff is now fifty-six years old, and defendant is fifty-nine years old. During their nearly thirty-year marriage, they had three children— A.R., who is emancipated; R.R., who was twenty-one years old and attending college at the time of this proceeding; and I.R., who regrettably passed away in 2015 at the age of nineteen from a rare form of pediatric cancer. Approximately three days after I.R.'s passing, on the second night of Shiva, the parties

"separated." In order to "cope" with I.R.'s demise, defendant claims he was prescribed medication and "drank alcohol while taking [his] medication" to "try[] to numb the pain . . . ." Following an argument between plaintiff's brother and A.R., plaintiff left the house with R.R. Defendant attempted to stop plaintiff from leaving, and the antenna of her car broke off in his hand. The police were called, defendant was arrested, and transported to a hospital. The next morning, November 19, 2015, plaintiff obtained a temporary restraining order (TRO) against defendant. According to defendant, the matter was heard and dismissed approximately two months later.[2]

On August 15, 2016, defendant retained Cyber Investigators, LLC (Cyber) to conduct surveillance of plaintiff. Defendant claims on August 17, 2016, after plaintiff and M.S. were at the parties' former marital home, M.S. texted plaintiff: "given the situation we should reduce the frequency of our visits; however, this does not change the way we feel about each other." On December 17, 2016, Cyber commenced its investigation.

On March 20, 2017, plaintiff obtained a second TRO against defendant and was granted a final restraining order (FRO) against him on July 5, 2017,

---

[2] Neither party included the TRO orders or transcripts in their appendices.

following a trial before a prior judge.[3]  M.S. accompanied plaintiff to the domestic violence hearing.  Plaintiff claims the prior judge found defendant had an "unhealthy and dangerous obsession" with her, which defendant denies. Because defendant made threats to M.S., such as "he knows [M.S.] has a daughter and knows the route that she walks to and from high school . . . [and] threats [to] 'cut[] his b. . . . off,'" and an incident when defendant followed M.S. resulting in a 9-1-1 call, M.S. was listed as a protected party on the FRO.

Following the FRO trial, the parties negotiated a Support and Property Settlement Agreement (PSA) through counsel and executed the document on October 19, 2017.  They agreed to delay their divorce until January 2018. Defendant informed Cyber "there was a good possibility he and [plaintiff] were going to reconcile and save their marriage."  According to defendant, "he had doubts" as to whether plaintiff would honor the PSA and "he suspected [she] would continue her cohabitation with [M.S.] even though her breaking up with [M.S.] and making a genuine effort at reconciliation was one of the key terms of the agreement."

---

[3]  Neither party included transcripts of the domestic violence trial or the FRO in their appendices.

As part of their PSA incorporated in the FJOD, defendant agreed to pay plaintiff a taxable "base alimony" of $100,000 annually, or $8,333.33 per month, predicated on his former employment and earnings at Bloomberg, LLP of $336,000 per year. In addition, the PSA sets forth a formula to compute future alimony payments, but in essence defendant agreed to: (1) pay "bonus alimony" of thirty-one percent of his annual gross bonus; (2) maintain his prior health insurance through his former employer for plaintiff's benefit (COBRA coverage) for three years following the entry of the FJOD or in the event alimony terminates, whichever occurs first; and (3) maintain a $1,000,000 life insurance policy on his life designating plaintiff as the beneficiary to secure the obligation. Defendant now pays $68,310 annually in alimony, or $5,692.50 per month.[4] In the PSA, plaintiff was imputed income of $35,000 per year and earns a modest income from her business, Metropolitan Hair Group.

The PSA provides that plaintiff's alimony "shall irrevocably terminate and cease" upon her death, her remarriage, or defendant's death. Article IV of the PSA provides:

> The payment of alimony by HUSBAND to WIFE as set forth in Article II of this [a]greement shall be subject to review upon any of the following events:

---

[4] Defendant's current alimony obligation is based upon his gross annual income of $242,000 along with an imputed income to plaintiff of $35,000.

A-3213-19

. . . .

> [(3)] WIFE's cohabitation as defined by New Jersey law shall trigger a review to determine whether alimony shall be terminated, irrevocably terminated, suspended or modified (if modification is a remedy provided by New Jersey law at the time an application is filed with the [c]ourt).

In 2016, plaintiff met M.S. and certified that as of February 19, 2020, they had been dating "for about three . . . years." Sometime in June 2016, defendant discovered telephone calls made between plaintiff and M.S. Plaintiff explained "[she] was going through . . . an inordinately difficult divorce and found comfort, understanding and companionship with [M.S.]."

Although Cyber surveilled plaintiff and M.S. throughout their three-year relationship, Cyber concentrated its investigation on the period following the parties' divorce—October 20, 2018, through September 16, 2019.

In a report dated May 16, 2019, Cyber determined:

> [I]t appears from their activity that they act as a family unit[,] . . . . [which] would . . . be apparent to friends and family during occasions such as holiday gatherings, weddings, birthdays, etc. It appears from the information developed that the couple go on many vacations together, are involved in children's schools and activities, attend synagogue events, attend entertainment events, entertain friends and family at [plaintiff's] home[,] . . . share household duties such as grocery shopping, etc. . . . [M.S.'s] apartment in Verona . . . appears to be necessary since his son attends high

6

A-3213-19

school there. However, we have gathered significant evidence showing [M.S.] spends consistent time at [plaintiff's] home in Mahwah . . . where he pulls into the driveway, opens the automatic garage door and parks/hides his car in the garage overnight and at other times.

Cyber concluded "[b]ased on the information developed over the course of the investigation, it is our opinion that a prima [facie] case exists that [M.S.] and [plaintiff] are cohabitating."

On January 17, 2020, defendant filed a notice of motion to terminate his alimony, life insurance, and health insurance obligations benefitting plaintiff, retroactive to June 2018. Defendant also sought reimbursement from plaintiff for monies he previously paid for life and health insurance premiums, to emancipate R.R., and requested counsel fees and costs. This aspect of defendant's motion is not raised on appeal. In his twenty-page moving certification, defendant proffered the observations, report, and photographs of David Murphy, who conducted the investigation of plaintiff on behalf of Cyber. Murphy detailed "the specific days and times" he observed M.S.'s vehicle in the driveway at plaintiff's Mahwah home, "using the garage door remote" to gain access to her residence, and bringing groceries to her on "ten . . . occasions" spanning six months.

Defendant further maintained that plaintiff and M.S.: (1) spend major holidays together, such as Thanksgiving and Rosh Hashana, at the homes of relatives and friends; (2) attend various community events together, including events sponsored by the Montebello Jewish Center; (3) took a trip together to Israel in November 2019; (4) visited A.R.'s house and attended his engagement party; (5) attend family and other weddings; (6) hosted parties; (7) shopped for furniture together; (8) vacationed together; and (9) accompanied R.R. to college for a parents' weekend. In his certification, defendant emphasized that plaintiff and M.S. "have been very careful in not leaving any evidence on social media" but "hold themselves out as husband and wife to the community" as evidenced by postings of plaintiff's friends on Facebook. Defendant contends plaintiff is unequivocally cohabitating with M.S.

Plaintiff filed a notice of cross-motion seeking to deny defendant's motion to terminate alimony and for the other stated relief, and she requested counsel fees and costs. In her cross-moving and opposing certification, plaintiff denied defendant's allegations as "preposterous" and "inapposite" to his assertion that her relationship with M.S. is "open and notorious." Plaintiff recounted the extensive domestic violence trial and the judge's finding that defendant was "incredible."

Plaintiff certified she is "not cohabiting with [M.S.] and [has] not at any time" and M.S. is not her life partner. Their families and close friends are aware they are dating, but plaintiff certified her religious group does not consider M.S. to be in a marriage type relationship with her, and a member of the group suggested she date another member who is single. She denied having any intertwined finances, joint holdings, or liabilities with M.S. and confirmed that M.S. lives with his sixteen-year-old son in Verona and shares fifty/fifty custody with his ex-wife. M.S. has "no clothes or toiletries at [her] house," and does not have a key or the code to enter through the garage. They do not share vehicles but occasionally ride in the same vehicle.

Plaintiff clarified she and M.S. "vacationed together" in Nashville, Boulder, Florida, Seattle/Portland, and Cape Cod, but she went to the Republic of Georgia without him. As to their relationship, plaintiff certified she "confided in [M.S.'s] sister that [she] was [']uncertain['] whether [the] relationship" would continue. Plaintiff stated she has "a full and complete life outside of [M.S.]" and gave examples, such as attending Al-A-Non meetings, Mah Jong classes, sailing club meetings, yoga, and gathering with friends to play Trivia. M.S.'s dog is kept at his home in Verona.

On average, plaintiff averred she sees M.S. "about [two] evenings a month" and they "have no plans to marry or to live together . . . ." Procedurally, plaintiff also contended that defendant breached the PSA by not first attempting to resolve the issues amicably, and his motion was deficient under Rule 5:5-4(a)(4)[5] because prior case information statements (CIS) and a current CIS were not included with his application. On February 26, 2020, defendant filed a reply certification.

On March 6, 2020, the judge heard argument and rendered a comprehensive oral opinion that day. The judge analyzed defendant's motion by applying the New Jersey alimony statute's enumerated factors:[6]

> Factor one, intertwined finances: [d]efendant presents no real evidence that plaintiff and [M.S.] had intertwined finances. He speculates that their finances are intertwined because they attend events and vacations together. And [a] past surveillance photo show[s] [M.S.] bringing groceries to defendant's home. . . .

---

[5] Rule 5:5-4(a)(4) states "[T]he movant shall append copies of the movant's current [CIS] and the movant's [CIS] previously executed or filed in connection with the order, judgment or agreement sought to be modified."

[6] The six factors are: (1) intertwined finances; (2) shared living expenses; (3) recognition of the relationship in the couple's social and family circle; (4) frequency of contact and duration of relationship; (5) shared household chores; (6) enforceable promises of support; and (7) all other relevant evidence. N.J.S.A. 21:34-23(n).

Factor two, sharing or joint responsibilities for living expenses: [a]gain, defendant presents no real evidence that [plaintiff] and [M.S.] have shared responsibilities for living expenses. Defendant relies on the photos taken by his private investigator. . . . [W]hat is undeniable is that [plaintiff and M.S.] have separate residences. . . .

[F]actor three, recognition of the relationship in the couple's social and media circle. Defendant presents the [c]ourt with some social media evidence suggesting that the plaintiff's relationship is recognized in their social and family circle. It does appear that they attend holidays together and that [M.S.] has assisted the plaintiff's children with important events in their lives. Plaintiff acknowledges as much, quite candidly. . . . All this is undisputed and is relevant to the [c]ourt's analysis.

Factor four, living together, the frequency of contact, the duration of the relationship and other indicia of a mutually supported interpersonal relationship: [p]laintiff . . . acknowledges that she and [M.S.] ha[ve] been in a relationship for three years. It does appear to be a committed relationship. . . . [T]hey go on vacations together. They spend some holidays together. [M.S.] does occasionally spend nights over the plaintiff's home. But, again, there is no evidence that the parties are living together on a full-time basis. They do maintain separate households.

Factor five, sharing household chores. Defendant has no real proof that plaintiff and [M.S.] regularly share household chores. . . . There may be some evidence of them grocery shopping and . . . some other isolated assistance around the home, but nothing systemic and nothing that really rises to the level of the definition of

11

cohabitation as contemplated by the statute and case law.

[F]actor six[,] . . . whether the recipient of alimony has received an enforceable promise of support. . . . [H]ere, there is no indication that plaintiff is the recipient of any enforceable promise from [M.S.].

[I]n light of the above, this [c]ourt finds that the defendant has not presented sufficient credible evidence to establish a prima facie showing of cohabitation under N.J.S.A. [2A:34-23(n)]. . . .

. . . .

[F]rom the [c]ourt's perspective, all the defendant has really demonstrated [is] that [plaintiff and M.S.] are in a dating relationship, . . . a committed relationship.

The judge denied defendant's motion to terminate alimony based upon cohabitation without prejudice and denied both parties' requests for counsel fees and costs. This appeal followed.

On appeal, defendant argues:

(1) the judge's failure to accept credible evidence of cohabitation and deny a prima facie case of cohabitation warranting discovery was a mistaken exercise of judicial discretion and error of law based solely on separate households; and

(2) the judge abused his discretion in failing to order discovery and schedule a plenary hearing based on the material facts in dispute.

12

II.

We first consider the well-settled principles that guide our review. Alimony is an economic right, which "arises out of the marital relationship and provides the dependent spouse with 'a level of support and standard of living generally commensurate with the quality of economic life that existed during the marriage.'" Quinn v. Quinn, 225 N.J. 34, 48 (2016) (quoting Mani v. Mani, 183 N.J. 70, 80 (2005)). "The basic purpose of alimony is the continuation of the standard of living enjoyed by the parties prior to their separation." Innes v. Innes, 117 N.J. 496, 503 (1990) (citing Mahoney v. Mahoney, 91 N.J. 488, 501-02 (1982)). Thus, alimony "permit[s] [a] [dependent] spouse to share in the accumulated marital assets to which he or she contributed." Konzelman v. Konzelman, 158 N.J. 185, 195 (1999) (citing Mahoney, 91 N.J. at 500-01).

Alimony "may be revised and altered by the court from time to time as circumstances may require." N.J.S.A. 2A:34-23. To make such a modification, a showing of "changed circumstances" is required. Lepis v. Lepis, 83 N.J. 139, 146 (1980); see Weishaus v. Weishaus, 180 N.J. 131, 140-41 (2004) (citations omitted). In Landau v. Landau, 461 N.J. Super. 107, 108 (App. Div. 2019), we held that "the changed circumstances standard of [Lepis] continues to apply to a motion to suspend or terminate alimony based on cohabitation following the

13

2014 amendments to the alimony statute, N.J.S.A. 2A:34-23(n)." Those amendments defined cohabitation as "involv[ing] a mutually supportive, intimate personal relationship in which a couple has undertaken duties and privileges that are commonly associated with marriage or civil union but does not necessarily maintain a single common household." N.J.S.A. 2A:34-23(n). To determine whether there is a prima facie showing of changed circumstances, the court must consider the terms of the order at issue and compare the facts as they existed when the order was entered with the facts at the time of the motion. See, e.g., Faucett v. Vasquez, 411 N.J. Super. 108, 129 (App. Div. 2009).

A prima facie showing of cohabitation constitutes sufficient changed circumstances under Lepis. Gayet v. Gayet, 92 N.J. 149, 154-55 (1983). Cohabitation has been defined as "an intimate relationship in which the couple has undertaken duties and privileges that are commonly associated with marriage." Konzelman, 158 N.J. at 202. Where a supporting spouse seeks to decrease or terminate alimony because of the dependent spouse's cohabitation, "the test for modification of alimony is whether the relationship has reduced the financial needs of the dependent former spouse." Gayet, 92 N.J. at 149-150. Alimony may be modified "when (1) the third party contributes to the dependent

spouse's support, or (2) the third party resides in the dependent spouse's home without contributing anything toward the household expenses." Id. at 153.

"[A] showing of cohabitation creates a rebuttable presumption of changed circumstances shifting the burden to the dependent spouse to show that there is no actual economic benefit to the spouse or the cohabitant." Reese v. Weis, 430 N.J. Super. 552, 570 (App. Div. 2013) (quoting Ozolins v. Ozolins, 308 N.J. Super. 243, 248 (App. Div. 1998)). The court must focus on the cohabitant's economic relationship to discern "whether one . . . 'subsidizes the other.'" Id. at 571 (quoting Boardman v. Boardman, 314 N.J. Super. 340, 347 (App. Div. 1998)). Whether this economic benefit exists requires a fact-intensive inquiry by the trial judge. Id. at 576.

Our scope of review of the trial court's decision is limited. "Whether an alimony obligation should be modified based upon a claim of changed circumstances rests within a Family Part judge's sound discretion." Larbig v. Larbig, 384 N.J. Super. 17, 21 (App. Div. 2006) (citations omitted). Each individual motion for modification is particularized to the facts of that case, and "the appellate court must give due recognition to the wide discretion which our law rightly affords to the trial judges who deal with these matters." Ibid.

(quoting Martindell v. Martindell, 21 N.J. 341, 355 (1956)).  We will not disturb the trial court's decision on alimony unless we:

> conclude that the trial court clearly abused its discretion, failed to consider all of the controlling legal principles, or must otherwise be well satisfied that the findings were mistaken or that the determination could not reasonably have been reached on sufficient credible evidence present in the record after considering the proofs as a whole.
>
> [Heinl v. Heinl, 287 N.J. Super. 337, 345 (App. Div. 1996) (citing Rolnick v. Rolnick, 262 N.J. Super. 343, 360 (App. Div. 1993)).]

Prior to the Legislature's adoption of the 2014 amendments, the legal criteria for cohabitation were not specified by statute but instead embodied in case law.  See, e.g., Konzelman, 158 N.J. at 195-203.  As the Supreme Court explained in Konzelman, cohabitation is typified by the existence of a marriage-like relationship "shown to have stability, permanency[,] and mutual interdependence."  Id. at 202; see also Reese, 430 N.J. Super. at 570 (similarly noting that "[c]ohabitation involves an 'intimate[,]' 'close and enduring' relationship, requiring 'more than a common residence' or mere sexual liaison" (second alteration in original) (quoting Konzelman, 158 N.J. at 202)).

Although "living together, intertwined finances such as joint bank accounts, sharing living expenses and household chores, and recognition of the

16

relationship in the couple's social and family circle" may support a finding of cohabitation, such illustrative examples must not be considered in a vacuum. Konzelman, 158 N.J. at 202. "A mere romantic, casual[,] or social relationship is not sufficient to justify the enforcement of a settlement agreement provision terminating alimony[,]" nor is simply sharing "a common residence, although that is an important factor. Cohabitation involves an intimate relationship in which the couple has undertaken duties and privileges that are commonly associated with marriage." Ibid.

In 2014, the Legislature addressed cohabitation in subsection (n) of N.J.S.A. 2A:34-23. That provision sets forth the following considerations that bear upon cohabitation issues:

> n. Alimony may be suspended or terminated if the payee cohabits with another person. Cohabitation involves a mutually supportive, intimate personal relationship in which a couple has undertaken duties and privileges that are commonly associated with marriage or civil union but does not necessarily maintain a single common household.
>
> When assessing whether cohabitation is occurring, the court shall consider the following:
>
> (1) Intertwined finances such as joint bank accounts and other joint holdings or liabilities;
>
> (2) Sharing or joint responsibility for living expenses;

(3)  Recognition of the relationship in the couple's social and family circle;

(4)  Living together, the frequency of contact, the duration of the relationship, and other indicia of a mutually supportive intimate personal relationship;

(5)  Sharing household chores;

(6)  Whether the recipient of alimony has received an enforceable promise of support from another person within the meaning of subsection h. of [N.J.S.A.] 25:1-5; and

(7)  All other relevant evidence.

In evaluating whether cohabitation is occurring and whether alimony should be suspended or terminated, the court shall also consider the length of the relationship.  A court may not find an absence of cohabitation solely on grounds that the couple does not live together on a full-time basis.

After carefully reviewing the amendments, "we [saw] no indication the Legislature evinced any intention to alter the Lepis changed circumstances paradigm when it defined cohabitation and enumerated the factors a court is to consider in determining 'whether cohabitation is occurring' . . . ."  Landau, 461 N.J. Super. at 116 (quoting N.J.S.A. 2A:34-23(n)).  We determined the party seeking modification still bears the burden of establishing "[a] prima facie showing of changed circumstances . . . before a court will order discovery of an

18

ex-spouse's financial status." Id. at 118 (alteration in original) (quoting Lepis, 83 N.J. at 157).

We recently held that evidence of all seven factors enumerated in N.J.S.A. 2A:34-23(n) is not required for the moving party "to establish a prima facie [showing] of cohabitation." Temple v. Temple, ___ N.J. Super. ___, ___ (App. Div. 2021) (slip. op. at 5). Nor does the statute contain all factors the trial court may consider when reviewing whether cohabitation exists. See id. at ___ (slip op. at 5-6). ("[T]he statute does not contain the alpha and omega of what ultimately [may] persuade a court that a[n] [ex-]spouse is cohabiting.").

The moving party satisfies its prima facie burden when the party has presented enough evidence for the "trier of fact [to] conclude the [dependent] spouse and another are in 'a mutually supportive, intimate personal relationship' in which they have 'undertaken duties and privileges that are commonly associated with marriage or civil union.'" Id. at ___ (slip op. at 7) (emphasis added) (quoting N.J.S.A. 2A:34-23(n)).

Thus, an appellate court should not disturb the Family Part judge's determination, unless the appellate court concludes: (1) the trial court failed to consider all the required cohabitation factors listed under N.J.S.A. 2A:34-23(n), see id. at ___ (slip op. at 5) ("To be clear . . . the Legislature mandates a court's

19

consideration of [all] factors in ultimately determining whether cohabitation is or has been occurring.");[7] (2) the trial court failed to grant defendant the benefit of all reasonable inferences in determining whether the facts support no other conclusion than cohabitation, see id. at ___ (slip op. at 3-4) (holding the moving party is "entitled to an assumption of the truth of [its'] allegations and the benefit of all reasonable inferences to be drawn from the evidence . . . marshaled"); or (3) the trial court's conclusion "could not reasonably have been reached . . . after considering the [evidence] as a whole." Heinl, 287 N.J. Super. at 345.

Here, the parties themselves voluntarily entered into the PSA.[8] The agreement "outlined the circumstances that will terminate the alimony obligation." Quinn, 225 N.J. at 50. "The payment of alimony by [defendant] to [plaintiff] as set forth [in] this [a]greement shall be subject to review upon . . . [plaintiff]'s cohabitation as defined by New Jersey law[,] [which] shall trigger a review to determine whether alimony shall be terminated, irrevocably terminated, suspended[,] or modified." Therefore, the judge was required to enforce the agreement "to terminate alimony upon cohabitation, even if

---

[7] Here, no party has alleged the trial court failed to consider all the required factors.

[8] Although defendant claims he was tricked into entering the alimony provision on the premise that the purpose of said PSA was to reconcile the marriage, he did not move to invalidate the alimony terms.

cohabitation does not result in any changed financial circumstances." Quinn, 225 N.J. at 50 (citing Konzelman, 158 N.J. at 197).

Here, defendant has the burden of establishing a prima facie showing of cohabitation. Landau, 461 N.J. Super. at 118 (citing Lepis, 83 N.J. at 157). To establish a prima facie showing of cohabitation, the moving party is required to produce enough evidence "[s]ufficient to . . . raise a presumption [of cohabitation] unless disproved or rebutted." Prima facie, Black's Law Dictionary 1209 (7th ed. 1999).

The moving party is "entitled to an assumption of the truth of his allegations and the benefit of all reasonable inferences to be drawn from the evidence he had marshaled." Temple, ___ N.J. Super. at ___ (slip op. at 3-4) (emphasis added). However, conclusory allegations will be disregarded. Lepis, 83 N.J. at 159. The judge may rely on the supporting documents and affidavits of the parties, ibid., but the judge cannot decide the dispute on the papers "[w]hen presented with competing certifications that create a genuine dispute [of] material fact[]." Temple, ___ N.J. Super. at ___ (slip op. at 4) (emphasis added); see also Lepis, 83 N.J. at 159 ("[A] party must clearly demonstrate the existence of a genuine issue as to a material fact before a hearing is necessary.");

Material fact, Black's Law Dictionary 611 (7th ed. 1999) (defining a material fact as "[a] fact that is significant or essential to the issue or matter at hand").

We recognize that a prima facie showing of cohabitation may be difficult to establish. Landau, 461 N.J. Super. at 118 (citing Konzelman, 158 N.J. at 191-92). "[R]eadily available evidence is often 'consistent with either a dating relationship or a cohabitation relationship.'" Ibid. (quoting Konzelman, 158 N.J. at 191-92). However, the difficulty of the moving party to establish a prima facie showing "cannot justify . . . invasion of [the ex-spouse's] privacy." Ibid.; see also Quinn, 225 N.J. at 54-55 ("There are few exercises more intrusive than . . . an inquiry [which] reveals a vast amount of personal information about the daily life of the [dependent] spouse that is of no concern to the [supporting] spouse."). The judge "should be careful not to permit a fishing expedition into a supported spouse's private affairs on a weak claim." Temple, ___ N.J. Super. at ___ (slip op. at 15).

As such, although in weighing the parties' sworn statements the moving party is "entitled to an assumption of the truth of his allegations and the benefit of all reasonable inferences to be drawn from the evidence [it] ha[s] marshaled," id. at ___ (slip op. at 3-4), discovery is only warranted "[w]hen the facts support no conclusion other than that the relationship has all the hallmarks of a

marriage." Quinn, 225 N.J. at 54. A mere romantic relationship between an ex-spouse and another, "characterized by regular meetings, participation in mutually appreciated activities, and some overnight stays in the home of one or the other, [does not] rise[] to the level of cohabitation. . . . [T]his level of control over a former spouse would be unwarranted." Ibid.

In Temple, where the trial judge held, without a hearing or factual findings, that the supporting spouse had failed to establish a prima facie showing of cohabitation, we reversed and concluded the supporting spouse had in fact established a prima facie showing of cohabitation and raised a genuine factual dispute regarding the relationship of the dependent spouse and her boyfriend of fourteen years. ___ N.J. Super. at ___ (slip op. at 16-7). We noted that the judge had "mistakenly weighed the parties' competing sworn statements and accepted as true [the dependent spouse's] explanation of the facts," while ignoring the abundance of evidence presented by the supporting spouse. Id. at ___ (slip op. at 3). In our decision, we noted the supporting spouse:

> [H]a[d] shown, based on . . . social media[,] . . . the way [the couple] presented in public, as well as information from family members, that [the couple] are now or have in the past resided together, that they have had a fourteen-year relationship, that they have traveled together extensively, and that there are other "indicia of mutually supportive intimate personal relationship."

23

. . . .

[N]ot being privy to the[] [couple's] financial arrangements and circumstances beyond what an outsider may see without unlawfully prying . . . decided to hire a private investigator.

This investigation produced considerable evidence of cohabitation or perhaps even a marriage. Specifically, in numerous social media posts over the span of the past seven years, [the boyfriend] referred to [dependent spouse] as "my wife."

. . . .

[H]e and [dependent spouse] traveled and participated in events extensively.

. . . .

[S]pent a considerable amount of time with [each other] at his . . . home . . . .

. . . .

[and] he has resided in [her] . . . apartment.

[Defendant] produced photos obtained by his private investigator that depict [dependent spouse] engaging in household responsibilities, such as bringing groceries into [the] home, performing other household shopping trips, and retrieving and opening mail. [She] is seen in these photographs using a key or entering the . . . residence through the garage keypad access code.

. . . .

24

> In opposing [supporting spouse's] motion, [dependent spouse] filed a certification in which she attempted to refute or explain all the information he presented.
>
> [Id. at ___ (slip op. at 8-14).]

Although there may have been non-cohabitation explanations, we noted the only question for the judge to consider was whether the supporting spouse "presented enough [evidence] to entitle him to discovery and an evidentiary hearing." Id. at ___ (slip op. at 14).

Here, in contrast to Temple, where the judge had "mistakenly weighed the parties' competing sworn statements and accepted as true [the dependent spouse's] explanation of the facts," while ignoring the abundance of evidence presented by the supporting spouse, id. at ___ (slip op. at 3), the judge did not abuse his discretion in weighing the credibility of the parties' sworn statements. Firstly, the judge entertained oral argument on the motions. Secondly, the judge did not ignore an abundance of evidence.

In Temple, the supporting spouse had provided: information from family members; numerous social media posts spanning seven years in which the boyfriend referred to the dependent spouse as "my wife;" traveled and participated in events extensively; spent considerable time with each other at their homes; and produced many photos depicting household responsibilities,

such as bringing groceries in, performing other household shopping trips, retrieving and opening mail, and using a key or entering the residence through the garage keycode access pad.  Id. at ___ (slip op. at 9-13).

Contrariwise, defendant in the matter under review provided no third-party affidavit or certification of friends or family; submitted only one social media post not made by the couple;[9] and simply produced a few photos depicting the occasional household responsibilities.  The judge highlighted "[d]efendant has no real proof that plaintiff and [M.S.] regularly share household chores. . . . There may be some evidence of them grocery shopping and . . . some other isolated assistance around the home, but nothing systemic."  Both parties largely rely on their certifications, for which defendant was entitled to an assumption of the truth and the benefit of all reasonable inferences.  Temple, ___ N.J. Super. at ___ (slip op. at 3-4).  However, the reasonableness of defendant's allegations is afforded to the judge, "who deal[s] with these matters."  Larbig, 384 N.J. Super. at 21 (quoting Martindell, 21 N.J. at 355).

---

[9]  Elana Kaplan, leader of Jewish Women's Renaissance Project, captioned a photo of the couples who went on the November 2019 trip to Israel, "Wonderful morning learning and meeting all of the Bergen Momentum men's trip participants and their spouses."

We disagree with defendant's assertion that he demonstrated cohabitation—that plaintiff and M.S. were in a "mutually supportive, intimate personal relationship in which a couple has undertaken duties and privileges that are commonly associated with marriage[,]" N.J.S.A. 2A:34-23(n)—based solely on the documents filed by both sides. Moreover, the judge found that plaintiff and M.S. spend time together but maintain separate residences. The judge's finding was based upon substantial credible evidence in the motion record and did not warrant further discovery. Therefore, we discern no abuse of discretion and defendant's motion was properly denied without prejudice.

## III.

As to defendant's second argument, since he failed to establish a prima facie showing of cohabitation, he is not entitled to discovery or a plenary hearing. Landau, 461 N.J. Super. at 119 (citing Lepis, 83 N.J. at 157). We conclude that the remaining arguments—to the extent we have not addressed them—lacked sufficient merit to warrant any further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3213-19