**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3782-19

JOAN EISINGER,

    Plaintiff-Respondent,

v.

DOUGLAS HERMAN,

    Defendant-Appellant.

_____

> Argued February 1, 2022 – Decided April 4, 2022
>
> Before Judges Hoffman, Whipple and Susswein.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FM-20-0523-14.
>
> Bonnie C. Frost argued the cause for appellant (Einhorn, Barbarito, Frost & Botwinick, PC, attorneys; Bonnie C. Frost, Matheu D. Nunn, and Jessie M. Mills, on the briefs).
>
> John E. Clancy argued the cause for respondent (Townsend, Tomaio & Newmark, LLC, attorneys; John E. Clancy, on the brief).

PER CURIAM

Defendant, Douglas Herman, appeals from a June 18, 2018 dual final judgment of divorce (JOD) and a April 30, 2020 order awarding plaintiff attorneys' fees and costs in the amount of $110,000 and denying defendant's request for attorney fees and costs.

After trial, the court entered its decision divorcing the parties accompanied by a written statement of reasons. The JOD provides, in essence:

> 1. Commencing July 1, 2018 defendant shall pay limited duration alimony to plaintiff for ten years of $3,000 per month.
> 2. Commencing July 1, 2018, defendant shall pay child support of $600 per month.
> 3. Defendant shall maintain life insurance for $200,000 designating the parties' son as beneficiary with plaintiff as trustee for as long as the child is unemancipated; plaintiff shall maintain life insurance in the amount of $100,000 designating the parties' son as beneficiary with defendant as trustee for as long as the child is unemancipated.
> 4. Commencing July 1, 2018, each party shall be solely responsible for their own debts and credit card accounts held in their own names; however, defendant shall be solely responsible for the $170,000 loan from his parents and the debt shall not be deducted from the sales proceeds of the sale of the former marital residence.
> 5. Defendant shall not receive a credit at closing of $80,000 for the paydown of the mortgage principal of the October 2, 2010 refinance.

A-3782-19

6. Defendant's request for credits pursuant to <u>Mallamo v. Mallamo</u>, 280 N.J. Super. 8 (App. Div. 1995),[1] is denied.

7. Defendant shall pay pendente lite arrears in the amount of $8,622.76 by July 1, 2018; defendant shall also pay any additional pendente lite arrears for the period from November 10, 2016 through June 20, 2018, by July 15, 2018.

8. The marital portion of the defendant's NAF Pension and NAF 401(k) Account shall be divided equally.

9. Plaintiff shall retain her Vanguard Roth individual retirement account (IRA) and her Fidelity IRA free and clear from any claim from defendant; defendant previously liquidated his Vanguard Roth IRA with a value of $10,969 as of September 13, 2013 to satisfy the $10,000 advance for counsel fees to plaintiff in the Order dated September 12, 2014.

10. The marital portion of the defendant's Vanguard Voyager Rollover IRA shall be divided equally.

11. Defendant shall pay plaintiff $7,531.36, equaling one-half of the cash withdrawal that the defendant retained when he liquidated the Sony Music Entertainment, Inc. Employee Investment Fund and rolled over the remaining balance into the Vanguard Rollover IRA in 2010.

12. The parties shall list the former marital residence for sale by July 1, 2018.

13. Commencing July 1, 2018, plaintiff shall be responsible for the carrying costs associated with the marital residence and shall receive a credit for any principal paid down on the mortgage; the sales proceeds of the marital home shall be divided 65% plaintiff, 35% defendant.

---

[1] The application of <u>Mallamo</u> credits refer to the modification of pendente lite support orders at the time final judgment is entered. <u>Slutsky v. Slutsky</u>, 451 N.J. Super. 332, 368 (App. Div. 2017).

14. Parties shall make any repairs to the residence recommended by the realtor with defendant advancing the funds which shall be shared 35% by plaintiff, 65% by defendant and, with defendant being reimbursed from plaintiff's share of the sales proceeds.

15. For the tax year 2018, defendant shall claim the mortgage interest and property taxes incurred from January 1, 2018 to June 30, 2018; commencing July 1, 2018, plaintiff shall claim the mortgage interest and property taxes incurred until the residence is sold.

16. The parties shall retain individual checking and/or savings accounts in their names, free and clear of any claim by the other. Defendant shall pay plaintiff $1,486, which is one half of the Provident Joint Checking account as of September 29, 2013. Defendant shall pay plaintiff $22,504, which is one half of the Provident Joint Savings account prior to defendant's withdrawal of $44,012.52 between June 10, 2013 and September 29, 2013.

17. Defendant shall retain the Scottrade investments except for the following: 127 shares of Fifth and Pacific Companies and 250 shares of Oracle Corporation, which shall be distributed to the parties equally, in-kind.

18. Plaintiff shall retain the 2000 Toyota Camry valued at $1,084. Defendant shall maintain the 2003 BMW gifted to him by his parents and the 2014 Hyundai which was purchased on March 15, 2014.

19. Defendant shall pay plaintiff one half of the trade-in value for the 2012 Hyundai Genesis, which was $18,000, less defendant's one-half share of the Toyota Camry value, totaling $8,458.

20. Defendant shall pay plaintiff one half of $23,055.94, or $11,528, representing plaintiff's share of the marital funds defendant used to make repairs on the 2003 BMW made between 2012 and 2015.

4

21. Defendant's Vanguard Voyager Select Brokerage (VVSB) account, which had a balance of $356,037.65 as of September 30, 2013, shall be divided equally.

The court entered its decision on counsel fees twenty-two months later, on April 30, 2020, awarding legal fees to plaintiff of $110,000. This appeal followed.

On appeal, defendant argues broadly that the court's decision was an abuse of discretion because every discretionary decision was made to his detriment. Specifically, he asserts error in the setting of alimony without a numerical quantification of the marital lifestyle and for an erroneous term; erroneous imputation of income to plaintiff; the inclusion of exempt assets and erroneous credits for automobiles and the marital residence under equitable distribution; erroneous pendente lite support; denial of Mallamo credits; and counsel fees. We affirm the dual final JOD in part, reverse in part, and remand for further proceedings as directed below.

Our review of a Family Part judge's factual findings is limited. Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). Such findings "are binding on appeal when supported by adequate, substantial, credible evidence." Ibid. Appellate courts "accord particular deference to the judge's factfinding because of 'the family

courts' special jurisdiction and expertise in family matters.'" Clark v. Clark, 429 N.J. Super. 61, 70 (App. Div. 2012) (quoting Cesare, 154 N.J. at 413).

"Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare, 154 N.J. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). "[A] trial judge who observes witnesses and listens to their testimony, develops 'a feel of the case' and is in the best position to 'make first-hand credibility judgments about the witnesses who appear on the stand.'" Slutsky, 451 N.J. Super. at 344 (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). We "review the trial court's legal conclusions de novo" and "do not pay special deference to its interpretation of the law." Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

Thus, the trial record informs our conclusions. The parties married on November 3, 1996, and have one unemancipated child, a son, who was attending college at the time of trial.

Between 1988 and 1998, plaintiff worked as a Licensed Clinical Social Worker (LCSW) in New York City, earning approximately $36,000 per year, until she became pregnant with their son in 1998. Her LCSW license in New York is no longer active and she is not licensed in New Jersey. After their son

was born, the parties decided that she would be his primary caregiver while defendant supported them and took care of the maintenance of the house.

Between 1998 and 2016, defendant worked at various companies, most recently, at Marine Corps Community Services in Quantico, Virginia, where he remained employed at the time of trial. Excluding 2010, during which he was unemployed for several months, his W-2 Medicare earnings averaged approximately $165,000 between 1998 and 2012 but varied from a low of $128,395 in 2004 to a high of $262,657 in 2000. Between 2012 and 2015, his W-2 Medicare earnings were as follows: $136,109 in 2012; $132,312 in 2013; $135,846 in 2014; and $144,286 in 2015. He also garnered approximately $7,000 per year in unearned income from investment dividends and annual distributions from two trusts established by his parents.

From July 2000 until May 2010, the parties lived together in a 2,800-square-foot, four-bedroom marital home in Berkeley Heights that they purchased for $600,000. It was then, after having been unemployed for almost a year, defendant moved to Virginia to work for the federal government in the information technology field as a manager of business systems for Marine Corps Community Services. Plaintiff remained in the home with their son, never moving to Virginia with defendant. When defendant returned to New Jersey to

visit their son on the weekends, the parties slept in the same bed in the marital home until spring or summer of 2013 when defendant started sleeping in the guest room or at his parents' apartment.

In 2010, plaintiff began working as a self-employed psychic, healer and "medical intuitive." She reports she channels departed ones and pets, clears spaces in person and remotely, works on people's auras, clears and aligns chakras, and works on karmic issues by going into past lives. She has numerous clients, with about 250 repeat clients that return to see her every few weeks or monthly, and she charges $90 per half-hour or $165 per hour with different rates for group events.

On September 24, 2013, plaintiff filed a complaint for divorce alleging irreconcilable differences. Defendant answered the complaint and filed a counterclaim. On September 12, 2014, under a pendente lite order, the court required defendant to pay all of plaintiff's Schedule A and Schedule B expenses, plus 78% of her Schedule C expenses each month. It also ordered defendant to pay plaintiff $10,000 to enable her "to have continued legal representation."

On July 27, 2016, trial commenced and concluded on December 12, 2016. Plaintiff's witnesses were herself, her accounting expert Jeffrey Lieberman, CPA, and her employability expert Dr. Charles Kincaid. Defendant testified, as

8

well as Herbert Herman, defendant's father, and Donna Kolsky, his employability expert.

It was clear that defendant handled the finances during the marriage. Defendant said that plaintiff knew "next to nothing" about the finances, other than the annual budget spreadsheets he shared with her. He described the marital lifestyle as a "comfortable," "upper-middle class lifestyle."

According to plaintiff, defendant "controlled every aspect of the finances" because "[t]hat was his forte" and she was comfortable with that arrangement. Although they had a joint checking account, she did not know what the marital expenses were at any point between 1997 and 2012, never saw any of the bills, and "had no idea what the marital standard of living was." Their credit cards, which she used, were in defendant's name only. Even after he moved to Virginia, defendant still handled the finances including the filing of their joint federal income tax returns for 2010, 2011, and 2012.

During the marriage, the parties seldom traveled or vacationed. Plaintiff said that they dined out twice per month and had a housekeeper. Defendant described that they "were house poor" during the marriage and rarely dined out. He thought plaintiff bartered with the housekeeper and didn't have to pay her. He regularly contributed money to his 401(k), typically the maximum allowed,

9

and he testified that any other marital savings was used to repair or improve the marital home or to pay down the mortgage.

The marital home was worth $725,000 per a recent appraisal and the mortgage balance was $280,000 as of May 2016. Plaintiff testified that defendant said his parents gave them $190,000 for a down payment as a gift, though defendant testified his parents loaned him the money and he listed the $190,000 as a loan on his 2016 case information statement (CIS). Defendant said that he reduced the loan balance to $170,000 in 2000 through a gift from his father.

Defendant also testified that in 2010, he paid down the mortgage principal by $80,000 out of the parties' checking account. He "believe[d]" it was "gifted money" from his parents that he used, but he admitted that he "can't point to every record and every transaction to prove it" and did not "know the exact origin of all of the money." Plaintiff's personal liabilities included multiple loans from her parents totaling $76,700 to cover her legal fees.

Plaintiff drove a 2000 Toyota Camry valued at $1,000. Defendant drove a 2003 BMW that his father gave him in September 2007, a 2012 Hyundai Genesis that he purchased during the marriage, and later a 2015 Hyundai Genesis that he purchased for $41,000 after he sold the 2012 Hyundai Genesis

for $18,000 without plaintiff's knowledge.  Defendant asserts that he acquired the 2015 Hyundai Genesis from "exempt assets."

The parties had a joint checking account at Provident Bank, and defendant had a Provident Bank money market account in his name only that plaintiff did not know about until just before the divorce.  After the divorce complaint was filed, plaintiff opened business and personal checking accounts with TD Bank and defendant opened checking and savings accounts with USAA Bank.

Plaintiff had two IRAs valued at approximately $20,000.  Defendant had a 401(k) valued at $71,034, which he claimed was acquired "post-separation," and an unvested pension which he again claimed was acquired "post-separation."  They maintained two Uniform Transfers to Minors Act (UTMA) accounts for their son valued at approximately $92,000.

Other significant assets included:

> A Scottrade investment account in defendant's name valued at over $300,000, most of which plaintiff conceded contained stocks exempt from equitable distribution;

> A VVSB investment account in defendant's name valued at approximately $345,000 that defendant contends is exempt from equitable distribution as it contains cash gifts made to him from his parents that plaintiff did not know about;

A Vanguard Roth IRA in defendant's name valued at approximately $11,000; and

A Vanguard Rollover IRA in defendant's name valued at approximately $523,000, which defendant claims is partially exempt from equitable distribution as it contains both pre-marital and post-marital retirement funds from prior employment at Sony Music Entertainment, Scholastic, Liz Claiborne, and Grey Global Group.

Plaintiff's CISs and federal income tax returns reflect a gross earned income as follows: $19,239 in 2012; $23,827 in 2013; $32,643 in 2014; and $28,479 in 2015. She is attempting to grow her client base such that she can work full-time, or at least thirty-five hours per week in this field. She formed relationships with two restaurants and a hair salon where she performs and hosts private parties. She has not considered returning to the social work or counseling fields because her current work is dichotomous with what a therapist does, and it would be unethical for her to practice in both areas at the same time.

Plaintiff earned $12,730 between January and April 2016. Her business expenses, which were not significant, included web hosting, liability insurance, business cards, and other supplies. She testified that she works full-time, seven days per week and responds to inquiries from her clients via telephone and electronically. She testified, however, that her income differs each month. Her time is also spent growing her business by advertising her services on social

media and via email, networking, looking for locations to host events, responding to client phone calls and emails, appearing on radio shows and podcasts, publishing two books, and reading and researching to "stay on top of things and to grow as a practitioner."

Plaintiff testified that the figures on her 2016 CIS reflect the joint marital lifestyle in effect before defendant moved to Virginia and that she reviewed the marital bills with a certified financial planner to estimate the expenses. The joint monthly Schedule A, B, and C expenses totaled $6,410. The joint monthly Schedule A expenses included a $1,368 mortgage payment, $1,294 in real estate taxes, $154 for homeowners' insurance, utilities including gas, electric, telephone, cable, internet, plus garbage removal, lawn care, pest control and other home maintenance and repairs totaling $3908. Plaintiff did not know the cost of the water and sewer expenses and had forgotten to include the association fee of approximately $350.

The joint monthly Schedule B expenses included automobile maintenance of $150. She testified that the parties did not have car payments until after defendant moved to Virginia, when he purchased a new vehicle, and that she did not know the cost of the automobile insurance. She drove a car with 168,000 miles on it that needed repairs. She omitted the cost of fuel. The joint monthly

Schedule C expenses included food, prescriptions, toiletries, clothing, hair care, domestic help, medical co-pays, eyeglasses, daycare, entertainment, and gifts totaling $2,352.

With respect to her current lifestyle, plaintiff estimated that her joint Schedule A, B, and C expenses had increased to $9,055. Her monthly Schedule A expenses decreased slightly, but her monthly Schedule B expenses increased substantially to $760 due to an anticipated $500 leased vehicle payment to replace her old vehicle, and her payment of fuel and insurance costs. Her monthly Schedule C expenses nearly doubled to $4,469 due to allotments for counseling and pre-college expenses for their son, medical insurance, club dues and memberships, vacations, savings, and life insurance. She included a savings component of $850 per month but testified that she "never knew what the money situation was during the marriage."

Defendant's 2016 CIS states that his gross earned income in 2015 was $120,286. He also garnered unearned income in 2015 totaling $25,431, which included dividend income from assets gifted to him by his father, as well as trust income from two trusts arranged by his parents. His average gross weekly earned income in 2016 was $2805 and, through May 14, 2016, he had earned $58,046. For 2016, his annual salary was $145,860, plus bonuses.

Defendant estimated the joint monthly marital lifestyle expenses at $10,612, about $4,200 higher than plaintiff's estimate, as his estimate included shelter expenses for both the marital home and his apartment in Virginia. The joint monthly Schedule A expenses included his $1,502 monthly rent payment in Virginia as well as the $1,368 mortgage payment, utilities for both residences, real estate taxes, and maintenance costs totaling $6,207. The joint monthly Schedule B expenses included auto insurance payments for three vehicles, maintenance, fuel and oil costs, and other commuting expenses totaling $1,226. The joint monthly Schedule C expenses included food, clothing, toiletries, medical care, entertainment, and $400 for children's lessons totaling $3,179.

With respect to his current lifestyle, defendant's Schedule A expenses increased while his Schedule B and C expenses decreased, for a total of $8,571 – about $2,000 less than the joint monthly marital lifestyle. His Schedule A expenses included an increased rent payment of $1,933, reflecting the difference in rent between a one-bedroom apartment and a two-bedroom apartment, plus the existing mortgage payment for a total of $6,524. His Schedule B expenses decreased, presumably because he was no longer paying for plaintiff's auto insurance, for a total of $652. His Schedule C expenses decreased due to less money spent on food, medical expenses, and entertainment, for a total of $1,395.

15

## Alimony and the Marital Lifestyle

Defendant contends that the court abused its discretion with respect to the alimony award in that it: (1) did not make its own quantification of the marital lifestyle; (2) failed to assess plaintiff's actual earning capacity as a social worker when it imputed income of $42,000 per year to her as a psychic, healer and channeler; and (3) failed to consider that the parties' marriage "terminated" in May 2010 when defendant moved to Virginia and plaintiff refused to relocate with him.

"The award of spousal support is broadly discretionary." Steneken v. Steneken, 367 N.J. Super. 427, 434 (App. Div. 2004), aff'd in part, modified in part, 183 N.J. 290 (2005). The court may order alimony "as the circumstances of the parties and the nature of the case shall render fit, reasonable and just." N.J.S.A. 2A:34-23. "[A]limony is neither a punishment for the payor nor a reward for the payee." Mani v. Mani, 183 N.J. 70, 80 (2005). "The basic purpose of alimony is the continuation of the standard of living enjoyed by the parties prior to their separation." Innes v. Innes, 117 N.J. 496, 503 (1990). "[T]he goal of a proper alimony award is to assist the supported spouse in achieving a lifestyle that is reasonably comparable to the one enjoyed while

16

living with the supporting spouse during the marriage." Crews v. Crews, 164 N.J. 11, 16 (2000).

Alimony awards are "governed by distinct, objective standards defined by the Legislature in N.J.S.A. 2A:34-23(b)." Gnall v. Gnall, 222 N.J. 414, 429 (2015). The court must consider the following statutory factors, with "[n]o factor . . . elevated in importance over any other factor unless the court finds otherwise":

> (1) The actual need and ability of the parties to pay;
>
> (2) The duration of the marriage or civil union;
>
> (3) The age, physical and emotional health of the parties;
>
> (4) The standard of living established in the marriage or civil union and the likelihood that each party can maintain a reasonably comparable standard of living, with neither party having a greater entitlement to that standard of living than the other;
>
> (5) The earning capacities, educational levels, vocational skills, and employability of the parties;
>
> (6) The length of absence from the job market of the party seeking maintenance;
>
> (7) The parental responsibilities for the children;
>
> (8) The time and expense necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment,

the availability of the training and employment, and the opportunity for future acquisitions of capital assets and income;

(9) The history of the financial or non-financial contributions to the marriage or civil union by each party including contributions to the care and education of the children and interruption of personal careers or educational opportunities;

(10) The equitable distribution of property ordered and any payouts on equitable distribution, directly or indirectly, out of current income, to the extent this consideration is reasonable, just and fair;

(11) The income available to either party through investment of any assets held by that party;

(12) The tax treatment and consequences to both parties of any alimony award, including the designation of all or a portion of the payment as a non-taxable payment;

(13) The nature, amount, and length of pendente lite support paid, if any; and

(14) Any other factors which the court may deem relevant.

[N.J.S.A. 2A:34-23(b).]

The court must "make specific findings on the evidence about all of the statutory factors" listed above. N.J.S.A. 2A:34-23(c). "[F]ailure to consider all of the controlling legal principles requires a remand." Boardman v. Boardman, 314 N.J. Super. 340, 345 (App. Div. 1998).

18

In its statement of reasons, the court addressed each of the requisite statutory factors. Because defendant only challenges the adequacy of the court's findings with respect to factor (4), the standard of living established during the marriage, and factor (5), as it relates to plaintiff's earning capacity and employability, we focus on those two aspects of the court's decision herein.

Marital Lifestyle

On statutory factor (4), the court's findings centered around the parties' 2016 CISs and, to a lesser extent, their testimony pertaining to the marital lifestyle. The court found that while plaintiff asserted in her CIS that "[t]he total monthly marital lifestyle was $6,410.00, or $76,920.00 a year, exclusive of car payments, repairs required for the sale of the residence and significant savings accumulated by the parties," defendant asserted in his CIS that "[t]he total monthly marital lifestyle was $10,612.00, or $127,344.00 a year, exclusive of various personal expenses, repairs required for the sale of the residence and significant savings and investments accumulated by [him]."

Without numerically quantifying what it determined the marital lifestyle to be, the court then examined the parties' proposed post-divorce budgets as asserted in each CIS. It found that plaintiff "claim[ed] her post-divorce budget is $9,055.00 a month, or $108,660.00 a year," but that said budget was "not

comparable to the moderate marital lifestyle in light of her testimony regarding the family's regular expenses." It concluded that her "revised post-divorce budget" was "$5,995.00 a month, or $71,940.00 a year, which is $415.00 a month less than the marital lifestyle [asserted in her CIS]."

In particular, the court determined that it was unlikely that, after the sale of the marital residence, plaintiff "will incur shelter expenses of $3,826.00 a month" and reduced her "reasonable Schedule A expenses for rent, insurance, utilities, water and sewer, maintenance, telephone, cable and internet" to $3,000 per month. It reduced her monthly Schedule B expenses from $760 to $560 upon concluding that a reasonable expense for a new automobile was $300 per month and not $500 per month. It reduced her monthly Schedule C expenses from $4,469 to $2,435 upon finding that most expenses listed were "subject to reduction or deletion" as they were "no longer applicable or appear inflated."

As to defendant's post-divorce budget, which he asserted to be "$8,571.00 a month, or $102,852.00 a year," the court found that it was "not reflective of the frugal lifestyle he described during the trial" and that "numerous expenses . . . can be deleted, or modified, including the costs associated with the residence, auto insurance, registration and license, vehicle maintenance, fuel and oil, commuting expenses, child's clothing and child's lessons." Thus, the court

20

concluded that defendant's "reasonable post-divorce lifestyle is $4,300.00 a month, or $51,600.00 a year."

Defendant contends that the trial court erred when it set an alimony award without having numerically quantified the marital lifestyle. This contention has merit, as "[a]n alimony award that lacks consideration of the factors set forth in N.J.S.A. 2A:34-23(b) is inadequate, and one finding that must be made is the standard of living established in the marriage." Crews, 164 N.J. at 26 (citing N.J.S.A. 2A:34-23(b)(4)).

"[I]n determining the marital standard, the trial court establishes the amount the parties needed during the marriage to maintain their lifestyle." Weishaus v. Weishaus, 180 N.J. 131, 145 (2004); accord S.W. v. G.M., 462 N.J. Super. 522, 532 (App. Div. 2020) ("[A] finding of marital lifestyle must be made by explaining the characteristics of the lifestyle and quantifying it."). "[A] trial judge may calculate the marital lifestyle utilizing the testimony, the CISs required by Rule 5:5-2, expert analysis, if it is available, and other evidence in the record." Ibid.

"The judge is free to accept or reject any portion of the marital lifestyle presented by a party or an expert, or calculate the lifestyle utilizing any combination of the presentations." Ibid. "[O]nce a finding is made concerning

the standard of living enjoyed by the parties during the marriage, the court should review the adequacy and reasonableness of the support award against this finding." Crews, 164 N.J. at 26.

In this case, the court failed to "establish[] the amount the parties needed during the marriage to maintain their lifestyle." Weishaus, 180 N.J. at 145. Its statement of reasons does not contain a numeric finding as to what the marital lifestyle was. It somewhat inconsistently described the marital lifestyle as "moderate" based upon plaintiff's testimony and "frugal" based upon defendant's testimony. It found that plaintiff's 2016 CIS estimated the marital lifestyle at $6,410 per month, and that defendant's 2016 CIS estimated the marital lifestyle at $10,612 per month. But it never resolved the $4,000 discrepancy between the two figures.

Although the court reviewed each party's 2016 CIS and reduced their current lifestyle budgets prior to awarding alimony, those calculations should have been undertaken in relation to the court's determination of what the marital lifestyle was. Instead, the court reduced plaintiff's current lifestyle budget in relation to her marital lifestyle estimate of $6,410 as shown on her 2016 CIS and reduced defendant's current lifestyle budget in relation to his marital lifestyle estimate of $10,612 as shown on his 2016 CIS. This approach is contrary to

22

well-established law, which emphasizes that establishment of the marital lifestyle is "the touchstone" for the initial alimony award. Crews, 164 N.J. at 16. For these reasons, we agree that the court abused its discretion in calculating the initial alimony award and remand to address the issue.

## Marriage Termination Date

The court deemed the date that plaintiff filed the divorce complaint, September 24, 2013, as the date of termination of the parties' sixteen-year marriage. "[A] marriage is deemed to end on the day a valid complaint for divorce is filed that commences a proceeding culminating in a final judgment of divorce. Mere physical separation of the parties . . . will not be deemed to terminate a marriage." Portner v. Portner, 93 N.J. 215, 225 (1983); accord Elkin v. Sabo, 310 N.J. Super. 462, 472 (App. Div. 1998).

Thus, defendant's contention that the marriage ended in May 2010 when he moved to Virginia and plaintiff refused to relocate with him is contrary to well-established law. Similarly, his contention that the court should have considered him to have been paying pendente lite support since May 2010 when awarding alimony in connection with N.J.S.A. 2A:34-23(b)(13) is neither supported by facts nor law.

Mallamo Adjustment

Also, under the umbrella of the alimony, defendant contends that the court abused its discretion when it denied his request for a <u>Mallamo</u> adjustment for overpayment of pendente lite support and failed to consider his "paydown on the principal of the mortgage on the marital home" between 2010 and 2018, totaling $134,442. In particular, he asserts that because the court ultimately awarded plaintiff $3,000 per month in alimony and $600 per month in child support, he is entitled to a <u>Mallamo</u> adjustment because he paid pendente lite support totaling "between $5,600 and $5,900 per month."

"[P]endente lite support orders are subject to modification prior to entry to final judgment . . . , and at the time of entry of final judgment. . . ." <u>Mallamo</u>, 280 N.J. Super. at 12 (citations omitted). "In many instances the motion judge" hearing a pendente lite application "is presented reams of conflicting and, at times, incomplete information concerning the income, assets and lifestyles of the litigants." <u>Id.</u> at 16. Often "a judge will not receive a reasonably complete picture of the financial status of the parties until a full trial is conducted." <u>Ibid.</u>

In analyzing a request for a <u>Mallamo</u> adjustment, the court must consider whether the amount of pendente lite support paid "was consistent with the marital lifestyle." <u>Slutsky</u>, 451 N.J. Super. at 369. "Any changes in the initial

24

orders rest with the trial judge's discretion" and are therefore reviewed under an abuse of discretion standard. Id. at 368.

The court denied defendant's request for a Mallamo adjustment. It reasoned that, pursuant to a September 12, 2014, pendente lite order, defendant was responsible for payment of all of plaintiff's Schedule A and B expenses, plus 78% of her Schedule C expenses during the pendente lite period. It found that "[t]he parties agreed that the allocated lifestyle expenses paid by [d]efendant were between $5,600.00 and $5,900.00 a month." It further found that "[d]efendant did not pay child support and [p]laintiff was responsible for 22% of Schedule C expenses." Without reference to any numerical findings pertaining to the marital lifestyle, it concluded that "[t]he [d]efendant did not overpay pendente lite support in this matter."

However, Mallamo adjustments are necessarily calculated in relation to, and dependent upon, the court's final determination of the marital lifestyle. Slutsky, 451 N.J. Super. at 368-69. Here, the court ruled upon the Mallamo issue without having first numerically quantified the marital lifestyle. We remand this issue for reconsideration following the court's entry of the necessary numerical marital lifestyle finding.

On statutory factor (5), the court thoroughly considered plaintiff's educational background, plaintiff's employment history and earnings as well as her status after her son was born in 1998.

The court thoroughly evaluated and considered expert testimony from plaintiff's expert, Kincaid, and defendant's expert, Kolsky, with respect to plaintiff's employability. Based upon Kincaid's testimony, the court found that plaintiff had "various vocational barriers to returning to her former career," which included lack of employment as a social worker for almost twenty years, lack of the requisite license, and "limited skills related to technology and virtually no computer skills." It determined that "the import of [Kincaid's] testimony is that [p]laintiff could not just restart her career as a social worker by sending in a check for $196.00 and getting a job." It credited his opinion that plaintiff's "income would steadily increase from the $30,000.00 range if she remained employed in her current capacity" and that, if she "re-entered the labor market in the Berkeley Heights area as a social worker," she would earn an "entry level salary . . . between $39,053.00 and $46,371."

The court also considered Kolsky's testimony "that [p]laintiff could immediately return to work in New York as a social worker after paying $196.00

to restore her professional license," that she "would then be eligible for employment . . . at the annual salaries in 2014 of $54,558.00 to $67,000.00" or "on a per diem basis at $55.00 per hour" and "could earn $75,982.00 within two to three years" or "in five to seven years, . . . $145,600.00 per year." It noted that Kolsky "based her opinion on the fact that [p]laintiff was [bilingual] in Spanish, although this was never confirmed at trial."

Ultimately, the court rejected Kolsky's opinion that plaintiff "only needs to send in a check for $196.00 and [then] she can resume her former career as a social worker earning $67,000.00 per year." The court found that plaintiff "would be required to pursue continuing education and training before she could return to work as a social worker" and that, by comparison, if she "continues with her current occupation as a psychic, healer and channeler, she does not need to update her educational requirements or undergo additional training." It further found that while plaintiff was self-employed "in a non-traditional business . . . there is a potential for growth and success as pointed out by [p]laintiff's expert." It also found that her "absence from her career as a social worker, her age, her lack of continuing education and her current self-employment makes [p]laintiff's return to the field of social work unreasonable

27

and unrealistic" and that these factors did "not support her return to her prior occupation."

In the end, the court concluded that plaintiff "is able to support herself in her current capacity as a psychic, healer and channeler" and did not find "that there is another alternative presently which would generate income for [p]laintiff and allow her to maintain a moderate lifestyle, in conjunction with the alimony award and distribution of marital assets." It imputed income to plaintiff of $42,000 per year "based on her historical income between 2014 and 2016, along with the anticipated growth of her business."

"The court may impute income based on the . . . former income at that person's usual or former occupation or the average earnings for that occupation as reported by the New Jersey Department of Labor." Elrom v. Elrom, 439 N.J. Super. 424 (App. Div. 2015). "[I]f potential earnings cannot be determined," the court may "impute income based on the [party's] most recent wage or benefit record." Ibid. "Imputation may also be justified when examining income reported by self-employed obligors, who control the means and the method of their earnings." Id. at 436.

"A trial court is free to accept or reject the testimony of either side's expert, and need not adopt the opinion of either expert in its entirety." Brown

v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002). "A trial judge's decision to impute income of a specified amount will not be overturned unless the underlying findings are inconsistent with or unsupported by competent evidence." Storey v. Storey, 373 N.J. Super. 464, 474-75 (App. Div. 2004). "Credibility findings are given substantial weight and deference." Id. at 479.

Here, the court's decision to impute annual income of $42,000 to plaintiff is supported by competent evidence, namely, Kincaid's expert report and opinion which the court found credible.

We also reject defendant's contention that the court "imputed income based on a net opinion" from Kincaid. "N.J.R.E. 703 sets forth the criteria for determining whether an expert opinion may be admitted into evidence and requires that the expert conclusions be founded in 'facts or data' and that those facts be 'reasonably relied upon by [other] experts in the field.'" Harte v. Hand, 433 N.J. Super. 457, 464 (App. Div. 2013) (quoting N.J.R.E. 703) (alteration in original). Kincaid's opinion is not a net opinion because it is supported by facts and is not simply conclusory. Moreover, we see no reason to require the court to determine that plaintiff must work in an occupation in which she is utilizing her advanced degree — and impute income to her on that basis — where demonstrated self-employment that does not require use of her advanced degree

is a viable option that will allow her to earn a comparable income. The court must "consider" and "realistically appraise" the party's educational background, work experience, employment status, earning capacity, and job opportunities in the region when determining how much income, if any, to impute. See Caplan v. Caplan, 182 N.J. 250, 268-69 (2005); Elrom, 439 N.J. Super. at 435; Storey, 373 N.J. Super. at 474. The court did so here.

We conclude that the court's imputation of income to plaintiff in the amount of $42,000 annually is supported by the record and should not be disturbed on appeal. Storey, 373 N.J. at 474-75.

### Equitable Distribution

Defendant contests the court's inclusion of two assets, the VVSB account and 250 shares of Oracle stock, as assets subject to equitable distribution. He also contests the court's allocation of other marital assets, including the 2012 Hyundai; the proceeds from the sale of the marital home; the Provident Bank money market account; the BMW repairs; and the Sony Music Entertainment 401(k) cash payment.

During divorce proceedings, the trial court is tasked with "effectuat[ing] an equitable distribution of the property, both real and personal, which was legally and beneficially acquired . . . during the marriage." N.J.S.A. 2A:34-

30

23(h). The governing statute "reflects a public policy that is 'at least in part an acknowledgment "that marriage is a shared enterprise, a joint undertaking, that in many ways is akin to a partnership."'" Thieme, 227 N.J. at 284.

"The goal of equitable distribution is to effect a fair and just division of marital assets." Steneken v. Steneken, 183 N.J. 290, 299 (2005). The trial court must: (1) decide what specific property is eligible for equitable distribution; (2) determine its value; and (3) decide how to equitably distribute it between the parties. Rothman v. Rothman, 65 N.J. 219, 232 (1974). In terms of eligibility, the governing statute exempts gifts from equitable distribution, providing that "all such property, real, personal or otherwise, legally or beneficially acquired during the marriage . . . by either party by way of gift, devise, or intestate succession shall not be subject to equitable distribution." N.J.S.A. 2A:34-23(h).

"In making equitable distribution of property, the Family Part must consider the factors outlined in N.J.S.A. 2A:34-23.1." Sauro v. Sauro, 425 N.J. Super. 555, 576 (App. Div. 2012). Those factors include:

    a.    The duration of the marriage or civil union;

    b.    The age and physical and emotional health of the parties;

    c.    The income or property brought to the marriage or civil union by each party;

d.   The standard of living established during the marriage or civil union;

e.   Any written agreement made by the parties before or during the marriage or civil union concerning an arrangement of property distribution;

f.   The economic circumstances of each party at the time the division of property becomes effective;

g.   The income and earning capacity of each party, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children, and the time and expense necessary to acquire sufficient education or training to enable the party to become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage or civil union;

h.   The contribution by each party to the education, training or earning power of the other;

i.   The contribution of each party to the acquisition, dissipation, preservation, depreciation or appreciation in the amount or value of the marital property, or the property acquired during the civil union as well as the contribution of a party as a homemaker;

j.   The tax consequences of the proposed distribution to each party;

k.   The present value of the property;

l.   The need of a parent who has physical custody of a child to own or occupy the marital residence or

residence shared by the partners in a civil union couple and to use or own the household effects;

m.   The debts and liabilities of the parties;

n.   The need for creation, now or in the future, of a trust fund to secure reasonably foreseeable medical or educational costs for a spouse, partner in a civil union couple or children;

o.   The extent to which a party deferred achieving their career goals; and

p.   Any other factors which the court may deem relevant.

[N.J.S.A. 2A:34-23.1.]

"Where the issue on appeal concerns which assets are available for distribution or the valuation of those assets, . . . the standard of review is whether the trial judge's findings are supported by adequate credible evidence in the record." Borodinsky v. Borodinsky, 162 N.J. Super. 437, 443-44 (App. Div. 1978). "However, where the issue on appeal concerns the manner in which allocation of the eligible assets is made," a reviewing court "determine[s] whether the amount and manner of the award constituted an abuse of the trial judge's discretion." Id. at 444; accord Steneken, 367 N.J. Super. at 435; Sauro, 425 N.J. Super. at 573 (quoting Genovese v. Genovese, 392 N.J. Super. 215, 223 (App. Div. 2007)).

The court considered and entered findings pertaining to each of the statutory factors listed at N.J.S.A. 2A:34-23.1, although some of its findings overlapped with those it made in connection with the alimony award. Defendant's contentions on appeal center less around the statutory factors and more around the court's findings regarding seven specific assets.

However, separate and apart from defendant's contentions pertaining to specific assets, since the court failed to quantify the marital lifestyle in connection with its alimony award as discussed above, that error has carried over into its rulings on the allocation of marital assets. In other words, both the alimony and equitable distribution rulings were "bottomed on a misconception of law." Sauro, 425 N.J. Super. at 573 (quoting Genovese, 392 N.J. Super. at 223).

N.J.S.A. 2A:34-23.1(d) requires the court to consider the standard of living established during the marriage when equitably distributing marital property. But in this case, the court failed to quantify the marital standard of living, or marital lifestyle, thus we remand the court's allocation of all marital assets for reconsideration once the marital lifestyle is quantified in the interest of fairness. See, e.g., Tannen v. Tannen, 416 N.J. Super. 248, 283 (App. Div. 2010) (upon concluding that a remand was warranted pertaining to equitable

distribution, the court also remanded for consideration of "any effect distribution may have upon child support and alimony" due to their interrelated nature).

With that in mind, we now address defendant's more specific contentions regarding the court's findings and conclusions about each contested asset. There are additional reasons that a remand is warranted – at least with respect to allocation of certain assets, including the Provident Bank money market account and the credit for BMW repairs – due to the court's failure to enter sufficient findings of fact and conclusions of law as required by Rule 1:7-4(a).

## VVSB Account

The court determined that the value of the VVSB account was $356,037.65 as of September 30, 2013. It ordered that the account "be distributed equally to the parties along with any gains and/or losses through the date of distribution" with the parties sharing the costs of distribution.

While the court credited testimony from defendant and his father that defendant received annual cash gifts from his parents between 1996 and 2005, it rejected defendant's testimony "that the cash gifts which eventually funded the Vanguard [VVSB] account were never commingled with marital funds." It found that defendant lacked "the documentary evidence needed to substantiate his position" and that, without it, his "testimony is simply not believable." In

sum, it concluded that defendant "did not establish by a preponderance of the credible evidence that the cash gifts which eventually funded the Vanguard [VVSB] account were not commingled with marital monies."

The court undertook a detailed analysis of the relevant testimony coupled with the documentary evidence that defendant produced. It explained that, according to defendant, the cash gifts "were initially put into Treasury bills" and after they matured, "they were converted into Certificates of Deposit (CDs)." It cited defendant's testimony "that over the course of twelve . . . years there could have been twenty . . . CDs and perhaps a dozen annual Treasury bills before that." Per defendant, "[e]ventually, the funds were transferred into" the VVSB account.

However, the court determined that "[t]he evidence presented at trial raises questions as to the location of the cash gifts before, during, and after their various reincarnation as Treasury bills (which were never produced or [other] documents), [m]oney [m]arket deposits, CDs, and Vanguard stock." It found that "[t]he voluminous records presented at trial did not include any proof as to where the cash was kept between January 9, 1996 and December 31, 2002." It also found that defendant "did not provide financial records to show when and how many Treasury bills he obtained with the cash gifts."

36

More specifically, the court explained that "[d]efendant did not produce bank statements to confirm where the funds were deposited as he received the cash gifts from his parents, except for two . . . deposits into a World Savings Bank Money Market account" of $35,000 on December 31, 2002, and $51,864.28 on July 6, 2004. And yet, "[b]etween January 9, 1996, and February 1, 2005, . . . [d]efendant was gifted $182,000.00, as confirmed by the checks presented at trial." It also cited defendant's testimony that he received $24,000.00 in 2006 but found that he "did not produce a check or other document to confirm the gift."

The court determined that as of December 31, 2002, "defendant had collected $120,000.00 in gifts" but that "[a]fter he deposited the $35,000.00 on December 31, 2002 there is no record of where the remaining $85,000.00 was located." As to the July 6, 2004, deposit, it found that the funds "came from a $50,000.00 CD defendant had opened on February 3, 2004" that "matured on May 3, 2004" and had earned interest. Defendant then withdrew that money on July 28, 2004. It further found that by February 2004, "the cash gifts to [d]efendant totaled $160,000.00 but the statements provided by [d]efendant documented deposits of only $85,000.00."

With respect to the CD statements that defendant produced, the court found that they "did not trace how these financial accounts evolved from the cash gifts of $182,000.00 that were received between 1996 and 2005." Although defendant testified that the VVSB account "was funded by three . . . CDs which he opened at World Savings Bank that had a total value of $265,000.00" the court found that "[t]he purchases of Vanguard stocks on February 28, 2006, May 30, 2007, and September 26, 2007 totaled $255,000.00." Moreover, it found that "[d]efendant opened other CDs at Countrywide on dates that conflicted with the World Savings Bank CDs" and "[t]here is no explanation for how [d]efendant was able to fund the Countrywide CDs when, according to him, all his gifted assets were already accounted for in the World Savings Bank CDs and/or Vanguard Stocks." The court further found that it was "undisputed that [p]laintiff had no knowledge of the cash gifts, Treasury bills, CDs, [m]oney [m]arket deposits, and Vanguard stocks."

The court's conclusion that defendant did not prove, by a preponderance of evidence, that the VVSB account was funded by gifts he received from his parents is supported by "adequate credible evidence in the record." Borodinsky, 162 N.J. Super. at 443-44.

## 250 Shares of Oracle Stock

The court also found that "[d]efendant did not sustain his burden of proof and establish by a preponderance of the credible evidence that the 250 shares of Oracle Corporation are exempt from equitable distribution as either a gift or a premarital asset." Thus, it ordered that the Oracle stock "be distributed equally to the parties, with the [p]laintiff receiving one-half . . . of the stocks . . . in kind."

Just as he did with the VVSB account, defendant contends that the 250 shares of Oracle stock were also purchased with gift monies and that the court therefore erred in determining that they were subject to equitable distribution. The record supports the court's conclusion that defendant failed to sustain his burden of proof, by a preponderance of evidence, that the 250 shares of Oracle stock are exempt from equitable distribution.

## 2012 Hyundai

The court found that "defendant traded [] in the 2012 [Hyundai] vehicle on April 10, 2014 for $18,000.00, . . . without [informing plaintiff]." A month earlier, he had "purchased a 2014 Hyundai Genesis without the [p]laintiff's knowledge or consent" with "exempt funds."

 A-3782-19

The court ordered that defendant would retain the 2003 BMW gifted to him from his father along with the 2014 Hyundai, and that plaintiff would retain the 2000 Toyota Camry. The court also ordered defendant to pay plaintiff "one [] half . . . of the trade-in value for the 2012 Hyundai Genesis acquired during the marriage, which was $18,000.00, less [d]efendant's one-half . . . share of the value of the Toyota Camry [$1,084.00]." Thus, defendant owed plaintiff $8,458.

Defendant contends that the court abused its discretion when it awarded plaintiff a credit for one-half of the gross sales price of the 2012 Hyundai, without considering his payoff of the $16,657.20 outstanding loan balance on the vehicle, resulting in a "net gain" for him of only $1,342.80. He does not cite legal authority for support of this. Considering defendant had the 2014 Hyundai and the 2003 BMW, while plaintiff had a 2000 Toyota worth around $1,000, the court's determination pertaining to the equitable distribution of the value of the 2012 Hyundai is not "an abuse of the trial judge's discretion." Borodinsky, 162 N.J. Super. at 444.

Proceeds from the Sale of the Marital Home

The court ordered that plaintiff shall receive sixty-five percent of the net proceeds following the sale of the marital home, and defendant shall receive thirty-five percent. It cited the "significant disparity in the financial

40

circumstances of the parties" and reasoned that "[e]ven with her share of the marital assets, [p]laintiff will not be able to maintain a lifestyle comparable to that maintained during the marriage" and that defendant "is in a far superior financial position" because "[h]e earns greater income, which is supplemented by dividends from his investments and the trust distributions from his parents" and "will continue to benefit from his parents' gifting and estate planning. . . ."

Defendant requested that the $170,000 balance of the $190,000 down payment loan from his parents be repaid from the sales proceeds, but the court found that his claim lacked credibility. It found that testimony from defendant and his father acknowledged that plaintiff had no knowledge of the loan and she was never shown the written promissory note signed by the defendant. Additionally, there are no documents or other records presented during the trial proving that there was a loan from the parents when the residence was purchased. Furthermore, it cited the father's testimony that defendant only had to repay the $170,000 if he and his wife needed the money.

Defendant also requested "a credit of $80,000.00 for having paid down the mortgage with pre-marital monies when he refinanced the property on October 2, 2010," but the court denied the request because his argument was not credible. Defendant did not provide any statements or other records to

41

substantiate his claim that he used pre-marital funds to reduce the mortgage or provide any proof as to the source of the $80,000. It further found that the Provident Bank money market statements from October 2010 confirmed that the $80,000 was paid from the marital funds withdrawn on October 1, 2010.

Because the court's findings and ruling concerning the loan are based in large part on its determination that defendant lacked credibility, they are entitled to deference. Cesare, 154 N.J. at 412. The court did not abuse its discretion when allocating the proceeds from the sale of the marital home. Borodinsky, 162 N.J. Super. at 444.

### Provident Bank Money Market Account

The court found that the Provident Bank money market account functioned as a "joint money market/savings" account. It noted plaintiff's testimony that defendant had withdrawn approximately $45,000 from the joint money market account without her knowledge and determined that bank statements confirmed that between June 10, 2013, and September 23, 2013, defendant liquidated $44,012.52 from the account and did not explain or otherwise document the reason for the withdrawals. Accordingly, the court ordered defendant to pay plaintiff $22,504, which was one half of the balance in the account prior to defendant's withdrawals.

Defendant contends that the court erred in finding that the account was a joint account because the account was always in his sole name. We find no support for that argument. Although it is true that the money market account was not set up as a joint account, there is no evidence that it contained exempt funds, such as gifts from his parents, or funds that predated the marriage. See Pacifico v. Pacifico, 190 N.J. 258, 269 (2007) ("[T]he burden of establishing immunity from distribution of a particular marital asset or portion of an asset rests upon the spouse who asserts it.").

However, defendant also argues that the court's finding under N.J.S.A. 2A:34-23.1(i) that "[t]here was no testimony regarding the dissipation of assets" conflicts with its treatment of the Provident Bank money market account; and thus, the court failed to provide a dissipation analysis in its statement of reasons. This argument has merit and warrants a remand because the court's findings do not adequately comport with Rule 1:7-4(a).

Rule 1:7-4(a) requires that "[t]he court shall, by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon in all actions tried without a jury, on every motion decided by a written order that is appealable as of right . . . ." "Naked conclusions do not satisfy the purpose of [Rule] 1:7-4." Curtis v. Finneran, 83

N.J. 563, 570 (1980).  "Meaningful appellate review is inhibited unless the judge sets forth the reasons for his or her opinion."  Salch v. Salch, 240 N.J. Super. 441, 443 (App. Div. 1990).

As noted, "N.J.S.A. 2A:34-23.1(i) requires the court, in making an equitable distribution of marital property, to consider the 'contribution of each party to the acquisition, dissipation, preservation, depreciation or appreciation in the amount of value of the marital property.'"  Kothari v. Kothari, 255 N.J. Super. 500, 506 (App. Div. 1992).  Although the Legislature has not defined "dissipation" in this context, courts have considered a variety of factors:

> (1) the proximity of the expenditure to the parties' separation; (2) whether the expenditure was typical of expenditures made by the parties prior to the breakdown of the marriage; (3) whether the expenditure benefitted the 'joint' marital enterprise or was for the benefit of one spouse to the exclusion of the other, and (4) the need for, and amount of, the expenditure.
>
> [Id. at 507 (quoting Spouse's Dissipation of Marital Assets Prior to the Divorce as a Factor in Divorce Court's Determination of Property Division, 41 A.L.R. 4th 421 (1985)).]

"The question ultimately to be answered by a weighing of these considerations is whether the assets were expended by one spouse with the intent of diminishing the other spouse's share of the marital estate."  Ibid.  When "property has been dissipated during the marriage the asset subject to

44

distribution may take the form of a cash indebtedness to be imposed by the court upon one spouse in favor of the other." Id. at 510.

In its statement of reasons under statutory factor N.J.S.A. 2A:34-23.1(i), the court found "no testimony regarding the dissipation of assets." That finding conflicts with its clear findings in other parts of the statement of reasons that plaintiff testified that defendant had withdrawn approximately $45,000 from the Provident Bank money market account without her knowledge.

Thus, it appears that the court implicitly concluded that defendant had dissipated $44,012.52 in cash from the Provident Bank money market account. But the court never cited Kothari or completed any sort of legal analysis pertaining to the dissipation of the Provident Bank money market account. It did not make findings concerning the proximity of the expenditure to the parties' separation, whether the expenditure was typical of those made by the parties during the marriage, and whether the expenditure benefitted the marital enterprise or solely defendant. We are constrained to remand for entry of the requisite findings of fact and conclusions of law as required by Rule 1:7-4(a).

### 2003 BMW Repairs

The court found that defendant owned a 2003 BMW that was gifted to him by his parents in September 2007. The court determined that defendant had

exclusive use of the BMW and it was not a marital asset subject to distribution. However, it determined that defendant used marital funds to make significant repairs to the BMW and that between June 25, 2012, and August 8, 2015, defendant spent $23,055.94 on the BMW. Consequently, the court ordered defendant to pay plaintiff half of $23,055.94, or $11,528, which represented plaintiff's share of the marital funds that defendant used to repair his BMW.

Defendant contends that the award constitutes a "double dip" because he paid for the pre-complaint repairs with marital funds and the court also awarded plaintiff part of the joint bank account. Based on our review, we conclude his "double dip" contention is unsubstantiated.

Defendant also asserts the record shows that he only spent $20,216.89 on repairs. The court failed to explain the source for the $23,055.94. Again, "[n]aked conclusions do not satisfy the purpose of [Rule] 1:7-4," Curtis, 83 N.J. at 570, and they inhibit "meaningful appellate review," Salch, 240 N.J. Super. at 443. Because the court failed to explain how it determined that defendant spent $23,055.94 on BMW repairs, we remand this issue for entry of findings of fact as required by Rule 1:7-4(a).

<u>Sony Music Entertainment 401(k) Cash Payment</u>

The court ordered defendant to pay plaintiff $7,531.36 as one half of the cash withdrawal he retained when he liquidated a 401(k) retirement benefit he had obtained while working for Sony Music Entertainment between 1993 and January 2000. In determining whether the asset was subject to equitable distribution, the court found that it was partially exempt because defendant was only married during one-half of his employment at Sony. The court attached a Schedule A to its opinion which lists the asset at issue as totaling $15,062.72. The court designated $7,531.36 of the total as exempt and the remaining $7,531.36 as marital, and, ultimately awarded plaintiff 100% of the marital share.

Defendant contends that the court erred when it awarded plaintiff half of these funds that were liquidated well over three years prior to the date of the complaint, were from his partially pre-marital savings, and were used for the parties' mutual benefit. He emphasizes that because the funds were used to pay the parties' living expenses as defendant was unemployed during that time, it was improper for the court to award plaintiff 100% of the marital share because plaintiff is benefiting from the same money twice.

47

But at trial, defendant offered inconsistent testimony about how he used the money. He initially testified that he used it to pay the parties' living expenses when he was unemployed. He later testified that he used the money to pay down the mortgage but admitted that he had no concrete documentation. Because defendant's testimony was inconsistent and he offered no documentation to corroborate it, defendant's "double dip" contention as to this 401(k) is not adequately supported by the record.

We do not conclude this was an abuse of the trial judge's discretion. Borodinsky, 162 N.J. Super. at 444. However, on remand, the court will have the opportunity to reconsider the allocation after it quantifies the marital lifestyle if adjustments are needed in the interest of fairness. See Steneken, 183 N.J. at 293.

## Attorney's Fees

Plaintiff had two different attorneys during the litigation. Her first attorney, Toni Belford Damiano of Damiano Law Offices, submitted a Certification of Services dated February 7, 2017, seeking $80,158.49 in attorney fees, $1,000.50 in costs, and $6,704.90 in interest, for a total of $87,863.89. Her second attorney, John E. Clancy of Townsend, Tomaio & Newmark, LLC,

48

submitted Certifications of Services dated February 1, 2017; August 1, 2018; and November 14, 2019, seeking a total of $174,556.02, excluding expert fees.

Defendant contends the court abused its discretion when it awarded plaintiff $110,000 in attorney fees because it: (1) erroneously relied upon the parties' settlement negotiations when it found that defendant had acted in bad faith; (2) failed to consider the parties' respective receipt of marital assets in determining their ability to contribute toward payment of fees; and (3) considered trial and post-judgment fee requests at the same time, without distinguishing between the two.

Although not specified in a point heading as required by Rule 2:6-2(a)(6), defendant also contends that the court failed to determine the lodestar prior to awarding plaintiff attorney fees. Because the court made no findings concerning its determination of the lodestar and failed to explain how it calculated the $110,000 attorney fee award to plaintiff, the court abused its discretion, and we vacate the attorney fee award.

N.J.S.A 2A:34-23 states, in relevant part:

> Whenever any other application is made to a court which includes an application for pendente lite or final award of counsel fees, the court shall determine the appropriate award for counsel fees, if any, at the same time that a decision is rendered on the other issue then before the court and shall consider the factors set forth

49

in the court rule on counsel fees, the financial circumstances of the parties, and the good or bad faith of either party.

If, upon consideration of all relevant factors, the court decides to award fees, it must "determine the 'lodestar,' which equals the number of hours reasonably expended multiplied by a reasonable hourly rate." J.E.V. v. K.V., 426 N.J. Super. 475, 493 (App. Div. 2012) (citing Yueh v. Yueh, 329 N.J. Super. 447, 464 (App. Div. 2000)). In doing this, the court must exclude any hours billed that are "not reasonably expended" and calculate the reasonable hourly rate as per community standards. Yueh, 329 N.J. Super. at 465 (citing Rendine v. Pantzer, 141 N.J. 292, 337 (1995)).

"Where this analytical framework is followed and the judge makes appropriate findings of fact, a fee award is accorded substantial deference and will be disturbed only in the clearest case of abuse of discretion." Id. at 466. Additionally, "[i]n considering an award of counsel fees, the judge must comply with [Rule] 1:7-4(a) and clearly set forth reasons for the exercise of discretion." Scullion v. State Farm Ins. Co., 345 N.J. Super. 431, 439 (App. Div. 2001).

The court issued a twelve-page statement of reasons for its $110,000 attorney fees award to plaintiff and its denial of fees to defendant. It entered the order on April 30, 2020, nearly two years after entry of the June 2018 dual

A-3782-19

judgment of divorce, and following numerous post-judgment proceedings. Defendant has not appealed the denial of his attorney fees, so we are only concerned with the amount of the court's award to plaintiff's counsel.

The court discussed the relevant procedural history, both pre-judgment and post-judgment, cited the attorney certifications submitted by Damiano and Clancy, and noted their hourly rates. It found that plaintiff incurred attorney fees of $80,158.49 and costs of $1,000.50, for a total of $81,158.99, while represented by Damiano and that the balance owed to Damiano, exclusive of interest, was $63,983.30. It further found that plaintiff incurred and paid attorney fees to Clancy totaling $115,355.42 between February 2, 2016, and February 1, 2017. It also found that plaintiff incurred and paid additional attorney fees of $59,200.70 between February 1, 2017, and October 4, 2019; thus, plaintiff incurred and paid to Clancy a total of $174,556.12.

After citing relevant law, the court analyzed each Rule 5:3-5(c) factor and ultimately granted plaintiff's request for attorney fees and awarded her $110,000, to be paid in three installments. Although the court properly considered the Rule 5:3-5(c) factors and made findings of fact relative to those, its statement of reasons violates Rule 1:7-4(a) because it does not provide any details about how, or if, it calculated the lodestar. The court did not determine

51

whether the fees charged were reasonable. Its decision does not state how many hours were billed, how many hours were reasonably expended, or how many hours (if any) the court excluded. Consequently, it is unclear why the court awarded $110,000 for attorney fees compared to any other amount.

Given the lack of "appropriate findings of fact," it is unclear whether the court utilized the proper "analytical framework," or abused its discretion. Hence, we are constrained to vacate the attorney fee award and remand for further proceedings.

Defendant's additional arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

We affirm the entry of divorce; the imputation of income to plaintiff; the inclusion of the Vanguard investment account, 250 shares of Oracle stock, the 2012 Hyundai, and half the Sony 401(k) as marital assets subject to equitable distribution; and the allocation of proceeds from the sale of the marital home, because those rulings are adequately supported by the record. We reverse the alimony award, the Provident Bank dissipation account conclusion, the amount calculated for BMW repairs, and the attorney fee award and remand for further proceedings, including statements of reason pursuant to Rule 1:7-4(a).

On remand, the court should first quantify the marital lifestyle and then reconsider the alimony award, the requested <u>Mallamo</u> adjustment, and the allocation of marital assets as necessary in the interest of fairness. It should also enter the requisite <u>Kothari</u> dissipation findings before making an award with respect to the joint account and make N.J.S.A 2A:34-23 findings, including calculation of the lodestar, before awarding attorney fees.

Affirmed in part, vacated in part, and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION